IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

JAMES ANTHONY SMART, JR.,

     Plaintiff,

     v.

DEKALB COUNTY, GEORGIA,

     Defendant.

CIVIL ACTION FILE NO.
1:16-CV-0826-WSD-JFK

## ORDER AND REPORT AND RECOMMENDATION

Plaintiff James Smart commenced this civil action in March 2016 with the filing of his Complaint against Defendant DeKalb County, Georgia, asserting claim(s) for violations of the Americans with Disabilities Act of 1990 ("ADA"), as amended by the ADA Amendments of 2008 ("ADAAA"), 42 U.S.C. § 12101, *et seq*., and particularly Section 12117(a). [Doc. 1 – Complaint)]. On July 1, 2016, with Defendant's consent, Plaintiff amended his Complaint to include a claim for violation of Section 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act"), as amended, 29 U.S.C. § 701, *et seq*., and particularly Section 794. [Doc. 13 – First Amended Complaint ("Am. Compl."), Exhibit 1 – Defendant's Consent]. Both parties have moved for summary judgment pursuant to Federal Rule of Civil Procedure 56 on Plaintiff's claims based upon the pleadings, statement of material facts, exhibits, and discovery materials

submitted to the Court.  [Docs. 52, 66].  Also pending before the Court is Defendant's motion [Doc. 68] to strike portions of one of Plaintiff's exhibits filed in support of his motion [Doc. 52] for summary judgment.

These matters, now ripe for disposition by the Court, are before the undersigned upon referral from the District Judge for Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

This civil action arises out of Plaintiff James Anthony Smart's claims of disability discrimination brought against his former employer, Defendant DeKalb County, Georgia, after being placed on refrain from duty status due to failing a physical specifically designed to recertify Plaintiff's commercial driver's license and establish Plaintiff's continued eligibility to drive commercial vehicles on the job. Plaintiff Smart alleges disability as a result of diagnoses of glaucoma and hypertension and contends that being refrained from duty as well as being precluded from returning to work and being denied reasonable accommodation for his disabilities constitute unlawful disability discrimination.

Because the evidentiary challenges raised in Defendant's motion [Doc. 68] to strike potentially impact the facts properly before the Court in resolving the parties' cross motions for summary judgment, these evidentiary matters are taken up first.

2

## I.   Evidentiary Matters

## A.   Defendants' Challenge to [Post-Deposition] Supplemental Declaration of James Smart

As a rule, the appropriate method for dealing with contested affidavits or declarations offered in support of or in opposition to a motion for summary judgment is "to consider a party's objections to affidavits [or declarations]" and to "disregard any improper testimony or evidence." Gaylor v. Greenbriar of Dahlonega Shopping Center, Inc., 975 F. Supp. 2d 1374, 1381–82 (N.D. Ga. 2013) (citation and internal quotation marks omitted). Rule 56(c)(4) of the Federal Rules of Civil Procedure provides:

> An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Fed. R. Civ. P. 56(c)(4). "[P]ersonal knowledge can be established by showing that the witness was in a physical position to see, hear, or otherwise perceive the matters to which the testimony relates." Johnson v. Scotty's, Inc., 119 F. Supp. 2d 1276, 1281 (M.D. Fla. 2000) (citing Fed. R. Evid. 602). In applying Rule 56(c)(4), the Eleventh Circuit has "consistently held that conclusory allegations without specific supporting facts have no probative value." Evers v. General Motors Corp., 770 F.2d 984, 986 (11th Cir. 1985) (citation omitted).

Defendants advance three arguments (or objections) to Plaintiff Smart's Supplemental Declaration. More specifically, Defendants assert that Plaintiff's Declaration is an improper attempt to circumvent Rule 30(c) of the Federal Rules of Civil Procedure, that Plaintiff's Declaration contradicts and seeks to make material changes to his deposition testimony, and that the date on the declaration, which is required under 28 U.S.C. § 1746, is illegible and, therefore, a nullity.  [Doc. 72 at 3–4].

Defendant first argues that Plaintiff's Declaration constitutes an improper attempt to circumvent Fed. R. Civ. P. 30(c), which provides for cross-examination of a deponent consistent with the Federal Rules of Evidence.[1]  While Defendant's concern is legitimate, defense counsel will have an opportunity to cross-examine Plaintiff Smart should the case proceed to jury trial.  See Fed. R. Evid. 611.

The Court next considers alleged factual inconsistencies between Plaintiff's deposition testimony and his Declaration.  This evidence is probative of whether Plaintiff can establish the threshold issue of disability.  Here, the gist of Defendant's objection is that in his declaration Plaintiff Smart elaborates about the effects and

---

[1] Rule 30(c) reads in pertinent part:

(1) Examination and Cross-Examination. The examination and cross-examination of a deponent proceed as they would at trial under the Federal Rules of Evidence, except Rules 103 and 615. . . .

Fed. R. Civ. P. 30(c)(1) (as amended 2015).

4

progression of the symptoms of his glaucoma prior to his two corrective Selective Laser Trebeculoplasty ("SLT") procedures which Defendant contends is contrary to Smart's deposition testimony that his glaucoma had not affected his ability to perform various activities.  For instance, during his deposition, when asked about actual limitations related to his vision, Smart testified that he had no issues and *was not limited* in his driving, reading, watching television, doing chores, engaging in activities with his adult twins (age 21) or his seven year old daughter, or taking care of himself on a day-to-day basis when wearing his glasses.  [Deposition of Plaintiff James Anthony Smart, Jr. ("Smart Dep.") 103–08]. Similarly, when asked about limitations following his SLT procedures on both eyes, Smart confirmed that he is not limited with respect to driving, reading, watching TV, participating in activities with his child, or taking care of himself on a daily basis. [Smart Dep. 106–07].  Smart testified as follows:

> Q:   Since your surgery on your left and right eye, have you had any issues in carrying out your day-to-day activities because of –
>
> A:   No.
>
> Q:   No?
>
> A:   No.

[Smart Dep. 106–07].

In his Supplemental Declaration, Smart discusses changes he noticed starting in 2014, including headaches that required him to lay down, dizzy spells, his eyes becoming watery and foggy, and increased dependency on eyeglasses, that resulted in a change in his medication and closer and more regular monitoring by his opthalmologist.[2]  [Smart Decl. ¶¶ 1, 2, 5].   According to Smart, "[t]here was a short time frame before I had surgery and in between the two surgeries" that he was adversely affected by symptoms of glaucoma and his deposition testimony about the lack of limitation referred to the present and the period of time before his condition worsened in 2014.  [Smart Decl. ¶ 6].  Smart declares that he advised the doctor at Caduceus that he was in between corrective procedures for glaucoma "but [the doctor] didn't care[.]"  [Smart Decl. ¶ 2].  Smart represents that his glaucoma is no longer severe thanks to his medication and surgeries.  [Smart Decl. ¶¶ 3, 7].

The undersigned does not exclude (or recommend) that Plaintiff's Supplemental Declaration be deemed a "sham" declaration.  "An affidavit [or declaration] may only be disregarded as a sham 'when a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact . . . [and that party attempts] thereafter [to] create such an issue with an affidavit [or declaration] that

---

[2]  Smart describes these portions of his declaration, some of which Smart attributes to his wife prompting and reminding him of earlier symptoms, as "a correction to [his] testimony at 106:7–20."  [Smart Decl. ¶ 5].

merely contradicts, without explanation, previously given clear testimony.'" <u>Tippens v. Celotex Corp.</u>, 805 F.2d 949, 954 (11th Cir. 1986) (quoting <u>Van T. Junkins & Associates, Inc. v. U.S. Industries, Inc.</u>, 736 F.2d 656, 658 (11th Cir. 1984)); <u>and see Kingsley v. Tellworks Communications, LLC</u>, 2017 WL 2624555, at **11–14 (N.D. Ga. May 24, 2017), <u>report and recommendation adopted by</u> 2017 WL 2619226 (N.D. Ga. June 15, 2017) (discussing application of Rule 56(c)(4) and the "sham affidavit" rule).

In response to Defendant's motion to strike, Smart represents that his deposition testimony at 106:7–20 is only addressing the period prior to his first eye surgery on March 2, 2015; that between 106:20–107:20, he is only addressing the period after his second eye surgery on April 27, 2015; and that he did not offer any deposition testimony about his vision for the period in between the two surgeries.  [Smart Decl. ¶ 4].  Smart's clarification is consistent with the questions of counsel that first asks about the period "[p]rior to your surgery" and then "[s]ince your surgery on your left and right eye[.]" [Smart Dep. 106–107].

The Court finds that the Smart Declaration is not directly contradictory to Plaintiff's prior testimony. <u>See Kingsley</u>, 2017 WL 2624555, at *14 (declining to exclude post-deposition declaration based upon discrepancies and stating that "while [the witness's] selective memory may contribute to an issue of fact for a jury to

7

resolve, it is not the sort of direct contradiction that justifies the extreme remedy of exclusion").  The Eleventh Circuit has cautioned that:

> [E]very discrepancy contained in an affidavit does not justify a district court's refusal to give credence to such evidence. . . . In light of the jury's role in resolving questions of credibility, a district court should not reject the content of an affidavit even if it is at odds with statements made in an early deposition.

Tippens, 805 F.2d at 954 (quoting Kennett-Murray Corp. v. Bone, 622 F.2d 887, 894 (5th Cir. 1980)) (internal quotation marks omitted).[3]  For these reasons, the Court overrules Defendant's objection to Smart's Supplemental Declaration and request that it be excluded.

Finally, Defendant's contention that the Plaintiff's declaration should be disregarded because the date is illegible is summarily dismissed.  See 28 U.S.C. § 1746.  The image of Plaintiff's signature is apparently shown via a screen shot of a computer screen and the date appears to the undersigned to be "6/25/16" but the year is admittedly unclear.  [Doc. 71-2 at 5].  Defendant argues that the date is a nullity because if the year is supposed to reflect 2017, the June 25 date is after Plaintiff's response was filed and that if the year is supposed to be 2016, it is before the date of Plaintiff Smart's deposition.  [Doc. 72 at 4].  However, the Court is not inclined to

---

[3] The Eleventh Circuit, in an *en banc* decision, Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

recommend striking the declaration for this reason given the certainty that Plaintiff will offer live testimony at trial should the case survive summary judgment.

Accordingly, Defendant's motion to strike or objection to Plaintiff's Supplemental Declaration is **DENIED**.

### B.    Defendant's Motion to Strike [Objection to] Portions of Dr. Henderson's Affidavit

Defendant contends that the affidavit of Polly A. Henderson, M.D. ("Dr. Henderson"), Plaintiff's Kaiser Permanente ("Kaiser") Opthalmologist, submitted by Plaintiff in support of his summary judgment motion, must be limited to lay testimony because the testimony constitutes undisclosed expert testimony in violation of Federal Rules of Evidence 701 and 702.[4]   [Doc. 68].  Defendant argues that Plaintiff did not

---

[4] Rule 702 reads in pertinent part:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue . . . .

Fed. R. Evid. 702.  Under Rule 701,

If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
(a) rationally based on the witness's perception;
(b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and

9

identify Dr. Henderson as an expert witness during discovery as required by Federal Rule of Civil Procedure 26(a)(2) or Local Rule N.D. Ga., 26.2C, and therefore her opinion testimony contained within Paragraphs 6–8 of the affidavit should be deemed inadmissible.[5] [Doc. 68 at 2–3].

Dr. Henderson provides evidence in support of Plaintiff Smart's claim that he is substantially limited in his vision (i.e., the major life activity of seeing) in that he has a limited range of vision as well as damage to his optic nerve. [Doc. 72 at 4–5]. The challenged portions of Paragraphs 6–8 read:

- When I wrote "limited range of vision" I meant that his range of vision was limited in comparison to an average person with normal healthy vision. Using somewhat different wording, it was also true that Mr. Smart had a "'limited range of vision' as compared to most people in the general population."

---

(c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Fed. R. Evid. 701.

[5] Rule 26(a)(2) requires that "a party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702 . . . ." Fed. R. Civ. P. 26(a)(2)(A). Similarly, Local Rule 26.2(C) encourages the early disclosure of expert witnesses of litigants so that parties have the opportunity to depose potential experts and makes clear that a party failing to comply with expert disclosure requirements "*shall not be permitted to offer the testimony of the party's expert*, unless expressly authorized by court order based upon a showing that the failure to comply was justified." L.R. N.D. Ga. 26.2(C) (emphasis added).

AO 72A
(Rev.8/82)

- This limitation on Mr. Smart's range of vision and damage to his optic nerve in March 2015 was substantial, as compared to a normal healthy eye and as compared to an average person in the general population, and required medical treatment.

- It is this damage to the optic nerve (and related tissue) that causes the loss of Mr. Smart's range or field of vision. This damage to Mr. Smart's optic nerve was substantial as compared to most people in the general population. This substantial damage to his optic nerve was present in March 2015.

[Henderson Aff. ¶¶ 6–8].[6]

Dr. Henderson was the treating opthalmologist during the relevant time period and twice performed laser eye surgery on Plaintiff Smart, first on March 2, 2015, and again on April 27, 2015. [Doc. 52-5, Exhibit 4 at 166–74 & 225–29; Henderson Aff. ¶ 5]. In the absence of expert disclosure, Dr. Henderson is able to competently testify under Rules 701 and 702, as to any lay opinion, namely, her opinions "rationally based on [her] perception" of Smart's impairment and "helpful to clearly understanding [her] testimony or to determining a fact in issue . . . ." See Fed. R. Evid. 701(a) and (b). Rule 701 only precludes opinion testimony "based on scientific, technical or other specialized knowledge within the scope of Rule 702[.]" Fed. R. Evid. 701(c). The characterization of the nature of the challenged evidence as expert or lay opinion is

_____

[6] This aspect of Dr. Henderson's testimony is not relevant to a "regarded as" disabled theory which does not require evidence that Plaintiff was substantially limited. See 29 C.F.R. § 1630.2(g)(1).

11

determinative.  See <u>Tischon Corp. v. Soundview Commc'ns, Inc.</u>, 2005 WL 6038743, at **9–12 (N.D. Ga. February 15, 2005) (evaluating likely admissibility of untimely proposed witnesses' testimony in light of undisclosed expert challenge and applying Rule 26(a)(2) and L.R. N.D. Ga. 26.2C).  Dr. Henderson's comparisons between Smart's optic nerve damage and limited range of vision and the general population require specialized knowledge and would qualify as expert opinion testimony.  For this reason, these portions of Dr. Henderson's affidavit arguably should not be considered in determining the parties' summary judgment motions.

Plaintiff suggests that even without Dr. Henderson's affidavit, medical records reveal Plaintiff's diagnosis of severe glaucoma and indications of nerve damage.  [Doc. 52-1 at 3 (citing Exhibit 4 at 64, 86)].  However, as discussed in detail *infra*, because the undersigned finds that Plaintiff presents sufficient evidence that Defendant DeKalb regarded him as disabled, the other two avenues of demonstrating disability are of less import and Dr. Henderson's affidavit does not create a genuine issue of material fact or otherwise sway the Court on any other issue, including actual disability.

For the reasons stated, Defendant's Motion [Doc. 68] to Strike is **DENIED**.

## II.    Factual Background[7]

When evaluating the merits of a motion for summary judgment, the court must "view the evidence and all factual inferences raised by it in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in favor of the non-moving party." Comer v. City of Palm Bay, Florida, 265 F.3d 1186, 1192 (11th Cir. 2001).  However, mere conclusions and unsupported self-serving statements by the party opposing summary judgment are insufficient to avoid summary judgment. See Ellis v. England, 432 F.3d 1321, 1326 (11th Cir. 2005).  In accordance with the foregoing principles, the following facts are deemed to be true for the limited purpose of evaluating the parties' cross motions for summary judgment.

Plaintiff James Anthony Smart, Jr. ("Smart"), is an African American male born on February 29, 1972.  [Smart Dep. 8–9].  Smart began working for DeKalb County Roads and Drainage ("Roads and Drainage") in June of 1995 as a Crew Worker and was subsequently promoted in March 2000 to Equipment Operator, then promoted in June 2001 to Equipment Operator Senior, and promoted in December 2004 to Crew Supervisor CDL. [Smart Dep. 131–34, Def. Exhibit 4 at 2–3].

---

[7] The record in this case is voluminous.  The Court does not cite every single piece of evidence relied upon by the parties or address each and every argument raised. What the Court finds to be the most probative evidence is discussed in greater detail within the Court's discussion.

On February 24, 2006, Smart submitted an application for a promotion to the position of Construction Supervisor with Roads and Drainage on the mill paving crew. [Smart Dep. 20–22, Def. Exhibit 4].  The application for the Construction Supervisor position asked the question, "Do you have a commercial driver's license?" [Smart Dep. 23, Def. Exhibit 4 at 2].   Smart answered "Yes" on his application and provided the following information about his commercial driver's license: (a) it was issued in the State of Georgia, (b) it was a Class A commercial driver's license ("CDL"), (c) the license number was 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, and (d) his CDL expired on March 31, 2016. [Smart Dep. 23, Def. Exhibit 4 at 2].

With the exception of Crew Worker positions, all DeKalb County positions in Roads and Drainage require a CDL license and the applications ask whether the applicant has a valid CDL license. [Smart Dep. 24].  All Roads and Drainage employees above a Crew Worker position are required to perform some CDL work. [Smart Dep. 24].

Plaintiff was offered and accepted the position of Construction Supervisor and assumed that role in June 2006.  [Smart Dep. 25–26].  In conjunction with his job as a Construction Supervisor, Roads and Drainage would intermittently require Plaintiff to submit to an alcohol or drug test.  [Smart Dep. 32–36, Def. Exhibits 10–13]. Approximately once every one to two years, Roads and Drainage would require that

14

Plaintiff undergo a physical examination for purposes of assessing whether Plaintiff could maintain his CDL.[8] [Smart Dep. 32].

### Caduceus & Plaintiff's Recertification CDL Physical

Caduceus is the third-party vendor occupational health medical provider for DeKalb County that administers various medical examinations for the employees of Roads and Drainage, including recertification physical exams for CDL holders employed by the county. [Deposition of Karyn Keaton-Bailey ("Bailey Dep.") 14; Defendant's Rule 30(b)(6) Witness – Deposition of Saxton Steceban Hudson ("Hudson Rule 30(b)(6) Dep.") 20–21; Deposition of Sterling Roaf, Jr., M.D. ("Dr. Roaf Dep.") 47–48]. DeKalb County does not make medical determinations with regard to CDL physical examinations. [Dr. Roaf Dep. 48].

On March 12, 2015, while at work, Roads and Drainage "informed" Plaintiff Smart that he "had to go" take a DOT physical recertification. [Smart Dep. 52; Deposition of Michael Brooks ("Brooks Dep.") 9]. That same day, Plaintiff went to Caduceus's medical office located at 3987 Lawrenceville Highway, Suite B, Tucker, Georgia, 30084 for a DOT physical recertification. [Smart Dep., Exhibit 16]. During

---

[8] During the relevant time period, Smart possessed a Class A CDL with an issuance date of March 1, 2011, an expiration date of March 1, 2016, and license number: 034486824. [Smart Dep. 42, Def. Exhibit 14]. The Class A CDL is the highest CDL which means that the holder of this type of CDL can operate all CDL vehicles (e.g., A, B, and C). [Smart Dep. 189].

Plaintiff's visit at Caduceus, Caduceus personnel, namely, Nurse Practitioner Andrea Hayes ("Hayes"), performed vision tests, an alcohol test, a drug test, a cardiovascular test and a blood test. [Smart Dep. 54–56; Dr. Roaf Dep. 24]. Smart advised that he had undergone his first SLT procedure for glaucoma on his right eye and was scheduled for the same procedure on his left eye to no avail. [Smart Decl. ¶ 3]. Caduceus personnel subsequently advised Plaintiff that he did not pass the physical. [Smart Dep. 54–56]. Following the physical recertification exam, Caduceus personnel refused to sign a Medical Certification Card for Plaintiff. [Smart Dep. 57, 63, Def. Exhibit 14].

### Refrain From Duty Status

On March 12, 2015, Caduceus issued a report stating, with regard to Plaintiff's "Work Status" that Smart was "Disqualified/Off Work" due to glaucoma / hypertension.[9] [Smart Dep. 57, 74, Def. Exhibit 16]. At the time, Defendant DeKalb County's Nurse Manager, Karyn Keaton-Bailey ("Bailey"), was responsible for ensuring that CDL drivers received their physicals in a timely manner (by scheduling physicals with Caduceus). [Bailey Dep. 11–12, 19–20, 22–23, 62, Pl. Exhibit 2; Smart

---

[9] It is undisputed that Caduceus, not DeKalb County, prepared the document indicating that Plaintiff Smart was "Disqualified/Off Work." [Doc. 71-1 at 21, Pl. Response No. 35 to Defendant DeKalb County Georgia's Statement of Undisputed Material Facts ("DSMF")].

16

Dep. 22–23]. Bailey received the notification from Caduceus that Plaintiff Smart was "Disqualified / Off Work." [Bailey Dep. 11–12, 19–20, 22–23, 62, Pl. Exhibit 2; Smart Dep. 22–23].

On March 12, 2015, Bailey sent a Work Status Form to Roads and Drainage refraining Smart from duty based on the documentation from Caduceus. [Bailey Dep. 17–20, 31, Pl. Exhibit 1]. The Work Status Form was addressed to Leo Owens, the designated contact in Roads and Drainage for employees refrained from duty. [Bailey Dep. 10–11, Exhibit 1; Deposition of Peggy Allen ("Allen Dep.") 39–40]. Owens was responsible for then alerting Smart's supervisors, including General Foreman Andre Thompson and Superintendent of the Asphalt Division Michael Brooks, that Plaintiff was being refrained from duty. [Allen Dep. 40, Exhibit 9]. Plaintiff Smart was sent home by Roads and Drainage as he was refrained from duty. [Smart Dep. 74].

According to Bailey, one of her responsibilities was to oversee the CDL Driver Program and ensure that every DeKalb County CDL driver maintained a medical blue card which was issued periodically (maximum period of up to 2 years) based upon physical examination geared towards CDL drivers. [Bailey Dep. 12–13]. Implementation of the CDL Driver Program was driven by a written memo from 1990 (DeKalb County's 1990 Policy) and the memo's expectation "that all CDL drivers in

17

the County must maintain a medical blue card in order to drive for DeKalb County government[.]"[10] [Bailey Dep. 13–14].

**Georgia DDS Letter Decertifying Plaintiff's CDL**

On March 16, 2015, Georgia Department of Driver Services ("DDS") mailed Plaintiff a letter at the address stated on his CDL (an old address) and provided to DDS. [Smart Dep. 44, 48, 190–91]. The letter from DDS referenced the same address, date of birth, and Class A CDL number stated on Plaintiff Smart's license and Medical Examiner Certificate. [Smart Dep. 44, 48, Def. Exhibits 14, 15]. The DDS letter stated as follows:

> Changes to state and federal law require the Department of Driver Services (DDS) to collect copies of the medical certificates held by all commercial drivers beginning January 1, 2012. Additionally, each commercial driver must certify or re-certify the type of driving in which he/she engages. Any commercial driver who fails to satisfy these requirements within the time allotted in that regulation will no longer be qualified to operate a commercial vehicle until they re-certify or submit a new medical qualification card to DDS.
>
> Your driving record indicates that either your medical certificate is expired or you have otherwise failed to comply with medical certificate requirements applicable to commercial drivers. As a result, the DDS will change your CDLIS medical certification status to "NOT-CERTIFIED", and you will no longer be qualified to operate a commercial vehicle effective 03/15/2015. Please note that your non-commercial driving

---

[10] In August 2016, Saxton Steceban Hudson replaced Bailey, former Nurse Manager, as the Occupational Compliance Manager for DeKalb. [Hudson Rule 30(b)(6) Dep. 5, 18].

privilege is not impacted by this.  However, you cannot lawfully operate a commercial motor vehicle on or after this date.

[Smart Dep. 49, Exhibit 15 at 1].

### Plaintiff's Efforts To Debunk Refrain From Duty Status

On March 17, 2015, pursuant to instructions from Caduceus, Smart visited his personal doctor's office with Kaiser, located on Panola Road, Lithonia, for a blood pressure examination.  [Smart Dep. 64–67].  Smart's blood pressure was 122/80.  [Dr. Roaf Dep., Exhibit 4; Smart Dep. 66–68].

Smart asked Kaiser to assist him demonstrating to Defendant that it was okay for him to drive.  Kaiser faxed a letter to Dr. Henderson and asked her to prepare a letter speaking to Smart's glaucoma and any driving limitations.  [Smart Dep. 66–67, 69].  On March 18, 2015, after several communications between Plaintiff and Kaiser, Dr. Henderson authored a letter for Plaintiff addressed, "To Whom It May Concern":

James A Smart has been treated in our office for Advanced Open Angle Glaucoma.  He has 20/20 vision in both eyes, but has a limited field of vision in both eyes.

[Dr. Roaf Dep., Pl. Exhibit 8; Smart Dep. 68–69].

Smart returned to the Caduceus office with follow-up letters concerning his high blood pressure and glaucoma.  [Smart Dep. 70–71, Pl. Exhibit 8; Bailey Dep. 35, Exhibit 2 Addendum].  One of the items obtained by Plaintiff and provided to

19

Caduceus was his eye chart from Kaiser. [Smart Dep. 75–77]. Caduceus informed Smart that the documentation he provided regarding his vision was not acceptable. [Smart Dep. 71–73]. Plaintiff was informed that Caduceus required Plaintiff to provide an exemption form from the Department of Transportation ("DOT") which could be obtained from the Georgia DDS. [Dr. Roaf Dep. 19–20]. Caduceus's records (addendum to original documentation of Plaintiff's March 12, 2015, visit) indicate that Dr. Roaf noted on March 20, 2014, "Needs vision waiver from DOT" and, on April 1, 2014, noted that Smart "Must contact state or federal department of transportation for vision waiver / exemption for limited field of vision[.]" [Doc. 66-4, Def. Exhibit 16]. Caduceus did not require any additional information about Plaintiff's blood pressure, and it appears that concerns about Plaintiff's high blood pressure were resolved to the satisfaction of Caduceus at that point. [Smart Dep. 77–78].

**DDS Vision Exemption Form**

Plaintiff Smart visited DDS and obtained a DDS Vision Exemption Form ("Vision Exemption Form") and spoke with DDS personnel about what needed to be done to complete the form. [Smart Dep. 78–79]. After obtaining the Vision Exemption Form, Smart took the form to Dr. Henderson's office at Kaiser to be completed. [Smart Dep. 79–80].

20

Based on a March 23, 2015, examination of Plaintiff (in between the two surgical procedures), on April 6, 2015, Dr. Henderson completed Plaintiff's Vision Exemption Form. [Doc. 52-5, Exhibit 5]. At that time, Dr. Henderson noted Plaintiff's left eye range of vision at 40 degrees and right eye range of vision at 60 degrees – below the requisite 70 degrees for the CDL physical exam. [Id. at 1 (measuring "FIELDS-HORIZONTAL MERIDIAN")]. Dr. Henderson described Plaintiff Smart's vision deficiency "10+ year history of Primary open angle glaucoma advance stage with peripheral field loss - both eyes[.]" [Doc. 52-5, Exhibit 5 at 2]. However, Dr. Henderson reported that Smart's vision deficiency was stable, that corrective lenses were needed for distance and near vision, that there was no double vision, and then did not answer a question about whether or not glasses or other treatment have corrected the deficiency. [Id. at 2]. Similarly, Dr. Henderson also did not answer the following question specifically posed to the examining medical professional, "In your opinion, does this person have sufficient vision to operate a commercial motor vehicle safely?" [Id. at 2]. And in terms of a professional opinion as to any restrictions that should be imposed, Dr. Henderson wrote, "Patient has limited peripheral vision." [Id. at 2]. Notwithstanding peripheral vision deficiency,

21

Plaintiff's visual acuity examination reflected 20/20 vision in both eyes with the use of glasses. [Id. at 1].

Once completed, Smart returned the Vision Exemption Form to Caduceus but was informed that he did not follow the correct procedure and that Dr. Henderson should have sent the completed form directly to DDS. [Smart Dep. 80–81]. Caduceus explained to Smart that they could not accept the completed Vision Exemption Form and that he would need to obtain a new or blank form and have Dr. Henderson resubmit it. [Smart Dep. 75–76, 81]. After receiving clarification on the procedure, Smart returned to DDS for another form, delivered it to Dr. Henderson and asked her to complete the form a second time. [Smart Dep. 81–82].

After Dr. Henderson's office submitted the second Vision Exemption Form, and while the same was pending with DDS, Smart returned to Caduceus and asked if they could release him to return to work. [Smart Dep. 82]. According to Smart, Caduceus advised him that "it was up to the county[.]" [Smart Dep. 85].

Smart testified that he repeatedly went to Caduceus and was never allowed to retake the CDL physical exam. [Smart Dep. 151]. Instead, Smart stated that he was always stopped at the front desk and asked about paperwork. [Smart Dep. 151]. Smart

22

made a final trip to Caduceus and was unsuccessful in his effort to return to work. [Smart Dep. 85].

### Plaintiff Allegedly Asks To Return To Work

Smart visited Owens and asked about returning to work and was advised by Owens that he didn't think he could have Plaintiff return without the CDL.  [Smart Dep. 83–84].  Smart emphasized to Owens that he wanted to come back to work and only had a couple more years and would try to retire. [Smart Dep. 83].  According to Plaintiff:

> I went up to the job.  I saw that [Leo] was in his office.  I walked in his office and I spoke with him and I asked him, I said, Leo, I need to come back to work.  Even if it means not driving a county vehicle.  Like I said and I stated to him, I've been here long enough I don't have to drive.  I mean if I need to grab a shovel and be a crew worker, I can do that and he told me he couldn't let me return to work until I passed a physical because my job required a CDL physical.

[Smart Dep. 14–23].  According to Smart, he told Owens that he did not need to drive a county truck and was willing to return to work as a crew worker because he needed to come back to work. [Smart Dep. 131].  According to Smart, "I begged Leo [Owens] to just help me find something I could do there to make some income."  [Smart Decl. ¶ 9].

23

**CDL Medical Card From Dr. Modi**

On or about June 23, 2015, Smart identified a private physician and went for an independent CDL physical exam. [Smart Dep. 87–88].  Smart obtained a Medical Examiner's Certificate from Dr. Vikash Modi indicating that Smart had passed the CDL physical requirements. [Smart Dep. 148–49, Def. Exhibit 17].  On June 26, 2015, in hopes of returning to work, Plaintiff went to work, clocked in, and presented the Modi medical card to Michelle Harkles, the Administrative Assistant to Owens. [Smart Dep. 149; Deposition of Michelle Harkles ("Harkles Dep.") 12–14; Owens Dep. 19–20].  Harkles advised Plaintiff that the Modi physical card was not acceptable because it was not issued by Caduceus. [Smart Dep. 149; Harkles Dep. 12–14; Owens Dep. 19–20].  Plaintiff has since renewed his Class A CDL using the medical examiner's certificate card issued by Dr. Modi.  [Smart Dep. 98].  Plaintiff renewed his Class A CDL on or about February 29, 2016, prior to the March 1, 2016, expiration date.

**DeKalb County 1990 Policy**

In 1990, DeKalb County issued a written policy regarding physical examination requirements for CDLs  ("1990 Policy").  [Deposition of Defendant's Second Rule 30(b)(6) Witness – Katherine Furlong ("Furlong Rule 30(b)(6) Dep.") 12, Exhibit 1].

24

The 1990 Policy provided that commercial drivers are to meet the physical standard requirements of private employer drivers.  [Furlong Rule 30(b)(6) Dep. 15. 30–32]. The 1990 Policy spoke to the means for satisfying the CDL physical examination requirement and explained:

> This may be accomplished by passing a physical examination provided by DeKalb County or by the employee, providing documentation that he or she has passed the State-required physical examination given by any physician acceptable to the State of Georgia.[11]

[Furlong Rule 30(b)(6) Dep., Exhibit 2].  The caveat was that DeKalb would not pay for the employee to test with a private physician.

**DeKalb County October 2015 Policy**

Effective October 2015, Defendant implemented a Fitness-For-Duty Policy ("October 2015 Policy") that governs CDL medical recertification requirements and replaced the 1990 Policy.  [Furlong Rule 30(b)(6) Dep. 8–11, Pl. Exhibits 1, 2].  The October 2015 Policy explicitly prescribed a procedure for disputes regarding employee physical or mental fitness and requires an employee or his or her physician to provide conflicting opinion to DeKalb's occupational health provider if one exists pertaining

---

[11] Doctors who provide CDL medical exams must be certified by the U.S. Department of Transportation, Federal Motor Carrier Safety Administration and specifically trained to administer CDL physician exams.  Qualified doctors may be located through at: (https://nationalregistry.fmcsa.dot.gov/NRPublicUI/home.seam).

to an employee's ability to return to work. [Furlong Rule 30(b)(6) Dep. 19, Pl. Exhibit 2].   According to Furlong, although not in writing at the time, the October 2015 procedure was the same process in existence for resolving this type of dispute prior to October 2015.  [Furlong Rule 30(b)(6) Dep. 19–23, 32].

**Plaintiff's Resignation**

On November 18, 2015, Smart resigned from employment with DeKalb County by tendering a resignation letter (consisting of one sentence) for his Roads and Drainage Construction Supervisor position. [Smart Dep. 26–27, Def. Exhibits 6, 7; Harkles Dep. 32–33, Def. Exhibits 1, 2; Allen Dep. 85–86, Def. Exhibit 1].  According to Smart, he resigned (out of necessity) in order to be able to access funds from his pension plan with DeKalb County. [Smart Dep. 115–116, 173, 191].  Smart represents that he didn't know about, and was not advised about, the 1990 Policy or the October 2015 Policy and that had he been aware he may not have had to resign.  [Smart Decl. ¶ 9].

26

**Plaintiff's Class A CDL Self-Certification**

Plaintiff Smart completed a DDS commercial driver self-certification form for a Class A CDL license dated January 9, 2014[12] (but likely completed in 2016) wherein he certified that he will operate or expect to operate in interstate or foreign commerce and that he is subject to and meets the FMCSA driver qualification requirements under 48 C.F.R. Part 391 and is required to obtain a medical examiner's certificate.  He also certified that he did not have an arm, foot, or leg that interfered with the normal tasks associated with the operation of a commercial motor vehicle and lastly that he needed a Medical certificate. [Smart Dep. 167, 195, Pl. Exhibit 6].

**Plaintiff's Lawsuit**

In Plaintiff's Amended Complaint, Smart alleges discrimination under Section 12117(a) of the ADA in Count I and discrimination under Section 794 of the Rehabilitation Act in Count II.  [Am. Compl. at 2–3, 8–9].  Both causes of action are based on the same facts and allege that Defendant DeKalb intentionally discriminated against Plaintiff solely on the basis of disability by placing Plaintiff on refrain from duty status in March 2015 and sending him home from work, by failing to provide

---

[12] In his deposition, Smart testified that he could not have self certified in 2014 and that he must have put the wrong date on the form.  [Smart Dep. 164–65].  Smart stated that he would have self certified in either 2015 or 2016.  [Smart Dep. 165].

27

Plaintiff a reasonable accommodation *in late March* to allow Plaintiff to work in a position that did not require driving, and by failing to allow Plaintiff to return to work *in June 2015* when he presented a renewed CDL with a valid medical certification to DeKalb.  [Am. Compl., Counts I and II].

In terms of relief, Plaintiff Smart seeks a permanent injunction enjoining DeKalb from engaging in employment practices that discriminate on the basis of disability, compensatory damages under the ADA in the amount of $300,000,  compensatory damages under the Rehabilitation Act, and an order directing DeKalb to "make Plaintiff whole" by compensating him for past and future pecuniary losses that resulted from the unlawful employment practices alleged, awarding appropriate back pay, lost earnings, and insurance premiums, reinstatement to his job, and by any other affirmative relief deemed necessary, including reinstating Plaintiff's full benefits under the employer-sponsored retirement program and other benefit programs, including full credit for all years served notwithstanding Plaintiff's early retirement and $29,000 lump-sum withdrawal from his pension benefits, plus attorneys' fees and costs.  [Am. Comp., Prayer for Relief at 9–11].

28

### III.   STANDARD OF LAW

Federal Rule of Civil Procedure 56 provides, "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (amended 2010). Rule 56(a) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 106 S. Ct. 2548, 2552 (1986). The standard for granting summary judgment mirrors the directed verdict standard under Rule 50(a), which requires the court to grant a directed verdict where there can be but one reasonable conclusion. See Anderson, 106 S. Ct. at 2511.

The movant bears the initial burden of asserting the basis of his motion, and that burden is a light one. See Celotex, 106 S. Ct. at 2553. The movant is not required to negate his opponent's claim. See id. Rather, the movant may discharge this burden merely by "'showing' - that is, pointing out to the district court - that there is an absence of evidence to support the nonmoving party's case." Id. at 2554.

When evaluating a motion for summary judgment, the court must view the evidence and factual inferences in the light most favorable to the nonmoving party. See Frederick v. Sprint/United Mgmt. Co., 246 F.3d 1305, 1309 (11th Cir. 2001). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 106 S. Ct. 1348, 1356 (1986). Instead, "the nonmoving party must present evidence beyond the pleadings showing that a reasonable jury could find in its favor." Fickling v. United States, 507 F.3d 1302, 1304 (11th Cir. 2007) (citing Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990)).

"Finally, the filing of cross-motions for summary judgment does not give rise to any presumption that no genuine issues of material fact exist." 3D Medical Imaging Sys., LLC v. Visage Imaging, Inc., 228 F. Supp. 3d 1331, 1336 (N.D. Ga. January 11, 2017). The Rule 56 standard is applied to cross-motions for summary judgment just as if only one party had moved for summary judgment and "simply requires a determination of whether either of the parties deserves judgment as a matter of law on the facts that are not disputed." Yager v. Lockheed Martin Corp., 2016 WL 319858, at *3 (N.D. Ga. January 26, 2016) (citation and internal quotation marks omitted); and see Shaw Constructors v. ICF Kaiser Eng'rs, Inc., 395 F.3d 533, 538–39 (5th Cir. 2004)

30

("Cross-motions must be considered separately, as each movant bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law.") (citation omitted).

## IV.   DISCUSSION

### A.   The Rehabilitation Act, 29 U.S.C. § 794(a)

"The Rehabilitation Act prohibits federal agencies [and recipients of federal money] from discriminating in employment against individuals with disabilities." Ellis, 432 F.3d at 1326 (citing Mullins v. Crowell, 228 F.3d 1305, 1313 (11th Cir. 2000)); see also 29 U.S.C. § 794(a); 42 U.S.C. § 1981a(a)(2).   "The standard for determining liability under the Rehabilitation Act is the same as that under the Americans with Disabilities Act, 42 U.S.C. § 12101, *et. seq*. ("ADA"); thus, cases involving the ADA are precedent for those involving the Rehabilitation Act." Ellis, 432 F.3d at 1326 (citing Cash v. Smith, 231 F.3d 1301, 1305 (11th Cir. 2000); and 29 U.S.C. § 794(d)).

Accordingly, Plaintiff's Rehabilitation Act claim is treated the same as, and effectively merges with, his ADA claim. [Doc. 70 at 2 n.1].

31

**B.      The Americans with Disabilities Act ("ADA") of 1990, As Amended By The ADA Amendments Act ("ADAAA") of 2008**[13]

"In enacting the Americans with Disabilities Act of 1990, Congress intended that the Act 'provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities' and provide broad coverage[.]" 42 U.S.C. § 12101(a)(1)(2008).  The ADA was "designed [in part] to . . . enable . . . persons [with disabilities] 'to compete in the workplace and the job market based on the same performance standards and requirements expected of persons who are not disabled.'" Paleologos v. Rehab Consultants, Inc., 990 F. Supp. 1460, 1464 (N.D. Ga. 1998) (quoting Harding v. Winn-Dixie Stores, Inc., 907 F. Supp. 386, 389 (M.D. Fla. 1995)).  The ADA prohibits covered employers from discriminating "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a); see also Wascura v. City of South Miami, 257 F.3d 1238, 1242 (11th Cir. 2001).

---

[13] The ADA was amended by the ADAAA in 2008, and the amendments became effective on January 1, 2009.  See Dickey v. Dollar General Corp., 351 Fed. Appx. 389, 391 & n.3 (11th Cir. 2009).

**1.      Alleged Discrimination Based Upon Plaintiff's Disability**

"Subchapter I of the ADA, which prohibits discrimination on account of disability in employment, covers the same employers and provides the same remedies contained in Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e(b)." Albra v. Advan, Inc., 490 F.3d 826, 829 (11th Cir. 2007) (citing 42 U.S.C. §§ 12111–12117).  As a result, "[t]he ADA adopts in large part the Title VII case precedent[,]" and "courts have used the Title VII cases as a guide for determining employer liability under the ADA." Huck v. Mega Nursing Services, Inc., 989 F. Supp. 1462, 1463 (S.D. Fla. 1997); and see Holly v. Clairson Industries, L.L.C., 492 F.3d 1247, 1255 (11th Cir. 2007) (in summary judgment context, "[t]he burden-shifting analysis of Title VII employment discrimination claims is applicable to ADA claims") (citation and internal quotation marks omitted); accord Durley v. APAC, Inc., 236 F.3d 651, 657 (11th Cir. 2000) (applying analytical framework prescribed in McDonnell Douglas[14] and Title VII cases in the context of ADA disability discrimination case) (citation omitted).  "The same general principles governing the order and allocation of proof in cases arising under Title VII apply to claims arising under the . . . ADA." Rossi v. Fulton Cty., Georgia, 2013 WL 1213243, at *11 (N.D. Ga. February 13, 2013)

---

[14] McDonnell Douglas Corp. v. Green, 93 S. Ct. 1817, 1824–25 (1973).

(citations omitted), report and recommendation adopted by 2013 WL 1213139 (N.D. Ga. March 22, 2013).

To establish a *prima facie* case of disability-based discrimination under the ADA, a plaintiff must demonstrate that: (1) he has a disability as defined in the ADA; (2) he is a "qualified individual," meaning that, with or without reasonable accommodations, he can perform the essential functions of the job he holds; and (3) he was discriminated against because of his disability.  See Mazzeo v. Color Resolutions Int'l, LLC, 746 F.3d 1264, 1268 (11th Cir. 2014) (citing Holly, 492 F.3d at 1256); Greenberg v. BellSouth Telecommunications, Inc., 498 F.3d 1258, 1263 (11th Cir. 2007).  The ADA's definition of "discriminate" includes a failure to make reasonable accommodations to the limitations of an individual with a disability.  See 42 U.S.C. § 12112(b)(5)(A).

### a.    Disability

In order to show that the ADA is applicable and offers Plaintiff protection, he must first show that he suffers from a "disability" in one of the three ways defined by the ADA.   The ADA defines the term "disability" as: "(A) a physical or mental impairment that substantially limits one or more major life activities . . .; (B) a record

34

of such an impairment; or (C) being regarded as having such an impairment . . . ." 42 U.S.C. § 12102(1)(A)–(C) (2009).

As contemplated by Congress and the 2008 amendment to the ADA, determining "'whether an individual's impairment is a disability under the ADA should not demand extensive analysis.'" Mazzeo, 746 F.3d at 1268 (quoting 42 U.S.C. § 12102(1) & n.2); see also 29 C.F.R. § 1630.2(j)(1)(iii) (explaining rule of construction that "[t]he primary object" or focus of ADA cases "should be whether covered entities have complied with their obligations and whether discrimination has occurred[,]" as opposed to "whether an impairment 'substantially limits' a major life activity").  The ADA's rules of construction regarding the definition of disability provide that "[t]he definition of disability shall be construed in favor of broad coverage of individuals. . . ." 42 U.S.C. § 12102(4)(A).

Plaintiff Smart contends that he is substantially limited ("actually disabled") in the following major life activities: 1) seeing; 2) hypertension / circulatory function; and 3) working.  Smart further contends that he was "regarded as disabled" because he was placed on refrain from duty status and that a record existed documenting Plaintiff's "glaucoma / hypertension" that demonstrated disability.  [Doc. 71 at 4–5].  If Plaintiff is unable to show that he's actually disabled, the record of impairment theory fails as

35

well.  See Hetherington v. Wal-Mart, Inc., 511 Fed. Appx. 909, 913 (11th Cir. 2013)

(citing Hilburn v. Murata Electronics North America, Inc., 181 F.3d 1220, 1229 (11th

Cir. 1999) (holding that the record-of-impairment standard is satisfied only if the

plaintiff "actually suffered a physical impairment that substantially limited one or more

of h[is] major life activities")).  Defendant disputes each of Plaintiff's claims of

disability. [Doc. 66-2 at 13–17].

### i.      Plaintiff Cannot Show "Actual Disability"

Plaintiff contends that he has an actual disability because he suffers from

glaucoma and hypertension and asserts that both "substantially limit[] one or more

major life activities[.]" 42 U.S.C. § 12102(1)(A).  "[M]ajor life activities include, but

are not limited to, . . . seeing . . . and working." 42 U.S.C. § 12102(2)(A).  The

relevant regulations provide that major life activities also include "[t]he operation of

a major bodily function, including but not limited to . . . circulatory . . . functions." 42

U.S.C. § 12102(2)(B).  The operation of a major bodily function includes the operation

of an individual organ within a body system." 29 C.F.R. § 1630.2(i)(1)(ii).  "The term

'substantially limits' shall be construed broadly in favor of expansive coverage, to the

maximum extent permitted by the terms of the ADA."  29 C.F.R. § 1630.2(j)(1)(i).

Courts making a disability evaluation must consider whether an impairment

36

"substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population."  29 C.F.R. § 1630.2(j)(1)(ii).  An impairment may be substantially limiting even if it does not "prevent, or significantly or severely restrict, the individual from performing a major life activity . . . ."  Id. "Nonetheless, not every impairment will constitute a disability within the meaning of [the ADAAA]."  Id.

"EEOC regulations inform the courts that the following factors are relevant in determining whether an individual has a disability: '(i) The nature and severity of the impairment; (ii) The duration or expected duration of the impairment; and (iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.'"  Shepard v. United Parcel Serv., Inc., 470 Fed. Appx. 726, 729 (11th Cir. 2012) (quoting Garrett v. University of Alabama at Birmingham Bd. of Trs., 507 F.3d 1306, 1311 (11th Cir. 2007)).

### a.    Major Life Activity – Seeing

First, the undersigned considers whether Plaintiff has produced sufficient evidence that he was substantially limited in the major life activity of seeing during the relevant time period, on or around March 2015.

37

Plaintiff Smart produces evidence from Kaiser, his health care provider, showing Smart's history of glaucoma for the past 10+ years. [Doc. 52-5, Exhibit 4]. Plaintiff also proffers evidence from his treating opthalmologist, Dr. Henderson, *supra*. [Doc. 52-7, Exhibit 6]. Plaintiff has established that his glaucoma is an impairment.

On February 5, 2015, Smart went for a follow up appointment for his glaucoma with Dr. Henderson. [Doc. 52-5, Exhibit 4]. At that time, Plaintiff's treatment for glaucoma included the daily use of three different types of prescription eye drops, Latanoprost, Dorzolamide-Timolol, and Brimonidine. [Doc. 52-5, Exhibit 4 at 159]. During the visit, Plaintiff reported compliance with prescribed medications and denied any side effects. The records reflect: "No visual acuity changes, eye pain, flashes, new floaters, and/or photophobia. No previous eye surgeries, lasers, injections. Patient did not use drops this AM." [Doc. 52-5, Exhibit 4 at 158]. Dr. Henderson's assessment noted in part as follows: "History of Primary Open Angle Glaucoma by report – intraocular pressure better both eyes today - but borderline; patient with significant cupping / pallor to nerves[]; + family history of glaucoma (mother); no chronic steroid use; no previous history of eye trauma - NO drops today per patient." [Doc. 52-5, Exhibit 4 at 162]. At the conclusion of the exam, Smart's instructions were to continue using the eye drops and to return to the clinic in one month for an

intra ocular pressure check and "possible SLT right eye[.]" [Doc. 52-5, Exhibit 4 at 162]. Shortly thereafter, surgery was recommended by Dr. Henderson to remedy the Plaintiff's glaucoma. Dr. Henderson twice performed laser eye surgery on Plaintiff Smart, first on March 2, 2015, and again on April 27, 2015. [Doc. 52-5, Exhibit 4 at 166–74, 225–29; Exhibit 6, ¶ 5]. Plaintiff's diagnosis on his right eye was "BILAT PRIMARY OPEN ANGLE GLAUCOMA, SEVERE STAGE." [Doc. 52-5, Exhibit 4 at 163, 166-170, 225–29]. Plaintiff's diagnosis on his left eye was "BILAT PRIMARY OPEN ANGLE GLAUCOMA, MODERATE STAGE." [Doc. 52-5, Exhibit 4 at 250].

As recorded on Plaintiff's DOT/DDS Vision Exemption Form, Dr. Henderson's March 23, 2015, examination established that Plaintiff's left eye range of vision at 40 degrees and right eye range of vision at 60 degrees – below the requisite 70 degrees for the CDL physical exam. [Doc. 52-5, Exhibit 4 at 212 (measuring "FIELDS-HORIZONTAL MERIDIAN")]. Aside from observing the Plaintiff's "limited peripheral vision[,]" which was deemed stable, Dr. Henderson did not identify any related restrictions relevant to Plaintiff's ability to participate in activities such as driving. Plaintiff's visual acuity examination reflected 20/20 vision in both eyes with the use of glasses. [Doc. 52-5, Exhibit 4 at 212–13].

39

In determining whether an impairment substantially limits a major life activity, "the ameliorative effects of mitigating measures . . . [with the exception of t]he ameliorative effects of the mitigating measures of ordinary eyeglasses or contact lenses" are not to be taken into account.[15]  42 U.S.C. §§ 12102(4)(E)(i)(I) and (ii).

Significantly, Plaintiff Smart testified that on March 12, 2015, at the time of his visit to Caduceus, he wore corrective lens eyeglasses and had been wearing glasses for approximately twenty years.  [Smart Dep. 103].  When asked about actual limitations related to his vision, Smart testified that he had no issues and *was not limited* in his driving, reading, watching television, doing chores, engaging in activities with his adult twins (age 21) or his seven year old daughter, or taking care of himself on a day-to-day basis when wearing his glasses.  [Smart Dep. 103–08].  In February 2015, Smart's refraction exam for visual acuity *with correction of glasses* was Right: 20/20-2 and Left: 20/20. [Doc. 52-5, Exhibit 4 at 161].

---

[15] Examples of the ameliorative measures identified in the statute include "medication, medical supplies, equipment, or appliances, low-vision devices (which do not include ordinary eyeglasses or contact lenses), prosthetics including limbs and devices, hearing aids and cochlear implants or other implantable hearing devices, mobility devices, or oxygen therapy equipment and supplies; use of assistive technology; reasonable accommodations or auxiliary aids or services; or learned behavioral or adaptive neurological modifications[.]"   42 U.S.C. § 12102(4)(E)(i)(I) – (IV).

AO 72A
(Rev.8/82)

Smart gave the exact same answers when asked about limitations following his glaucoma procedures on both eyes, confirming that he continues to wear his glasses and is not limited with respect to driving, reading, watching TV, participating in activities with his child, or taking care of himself on a daily basis. [Smart Dep. 106–07]. Smart testified as follows:

> Q:   Since your surgery on your left and right eye, have you had any issues in carrying out your day-to-day activities because of –
>
> A:   No.
>
> Q:   No?
>
> A:   No.

[Smart Dep. 106–07]. In summary, the evidence before the Court, including Plaintiff's own testimony, reveals that Plaintiff's glaucoma did not substantially limit him in any way. In an attempt to deflect from Smart's testimony, Plaintiff's counsel points to the following statement by Dr. Henderson:

> Glaucoma is sometimes called the silent thief because it causes vision loss (and optic nerve damage), including the loss of range of vision, that is often not noticed by the patient until the disease has already caused significant harm.

[Pl. Exhibit 6, ¶ 13]. Plaintiff's argument is misplaced. As defined by the ADA, not every impairment constitutes an actual disability. See 29 C.F.R. § 1630.2(j)(1)(ii).

41

Smart's Supplemental Declaration does not alter the Court's analysis. According to Smart, "[t]here was a short time frame before [he] had surgery and in between the two surgeries" that he was adversely affected by symptoms of glaucoma. [Smart Decl. ¶ 6]. In his declaration, Smart discussed changes he noticed starting in 2014, including headaches that required him to lay down, dizzy spells, his eyes becoming watery and foggy, and increased dependency on eyeglasses, that resulted in a change in his medication and closer and more regular monitoring by his opthalmologist. [Smart Decl. ¶¶ 1, 2, 5]. There is no record of Plaintiff experiencing these symptoms while at work or evidence that any of these issues caused Plaintiff to be absent from work or interfered with his ability to work. In fact, Smart reports that he experienced these symptoms while he was already on leave due to his wife having a stroke. [Smart Decl. ¶ 1]. Smart represents that his glaucoma is no longer severe thanks to his medication and surgeries. [Smart Decl. ¶¶ 3, 7]. Indeed, Smart represents that he "hardly ever [has] any problems if [he] can take [his] medication."[16] [Smart Decl. ¶ 3].

---

[16] Even so, there is no evidence beyond the statements made in Smart's Supplemental Declaration that without medication Plaintiff was "substantially limited."

Construed in the light most favorable to Plaintiff on this issue, Smart's testimony is that any limitations he experienced were less than severe and of a relatively short duration and therefore do not constitute an actual disability.[17] <u>See, e.g.</u>, <u>Wilson v. Dollar General Corp.</u>, 122 F. Supp. 3d 460, 465–66 (W.D. Va. 2015) (holding plaintiff not disabled under ADA despite blindness in one eye given no restrictions noted by treating physician and plaintiff's testimony that his vision was restored to 20/25 and that he was capable of doing anything that a person with two eyes could do); <u>and see</u> <u>Wyatt v. Maryland Institute</u>, 2012 WL 739096, at *4 (D. Md. March 7, 2012) (glaucoma held not to constitute actual disability for purposes of Section 12102(1) of the ADA even though plaintiff was restricted in his ability to drive at night).

Defendant refers the Court to <u>Hutcherson v. Int'l Marine and Indus. Applications, LLC</u>, 2016 WL 951569 (S.D. Ala. March 8, 2016), where plaintiff's testimony revealed no substantial limitation in vision with the use of corrective lenses and was found to not have any actual disability under the ADA. Hutcherson was hired

---

[17] While the parties argue over the persuasiveness of cases under the pre-2008 version of the ADA, under either version of the statute, the plaintiff must show some actual limitation with respect to the life activity of seeing in order to establish "actual disability" and Smart is simply unable to do so.

43

as a sandblaster but was not able to wear his employer's choice of safety helmet over his glasses, requested time to see if he could transition from glasses to contact lenses instead, but was advised by his employer that they could not use him. Id., at *1. While not a glaucoma case, the plaintiff in Hutcherson had 20/60 minus vision in each eye but 20/20 vision with corrective lenses, plaintiff required no eye surgery, did not regularly visit doctors for his eyes, and had previously worked a variety of jobs notwithstanding his vision problem. Id., at *3. Hutcherson conceded at his deposition that he had "no issues driving or reading when wearing glasses" and similarly testified that he "rides horses, does yard work, tends to his garden, drives all-terrain vehicles, and participates in other activities." Id. Given the plaintiff's testimony revealing that plaintiff was "not substantially limited in any readily discernible life activity," the court granted summary judgment in favor of the defendant. Id. Plaintiff Smart, like Hutcherson, is unable to show that he is substantially limited in any readily discernible life activity.

For these reasons, Plaintiff is unable to show that his glaucoma "substantially limits" a major bodily function or major life activity. See 42 U.S.C. § 12102(1); 29 C.F.R. § 1630.2(i)(1)(ii).

44

### b.      Hypertension – Major Life Activity – Circulatory Function

Plaintiff Smart further contends that his hypertension constitutes an actual disability.  In 2014, Smart began taking medication (Amlodipine) to lower his blood pressure. [Smart Dep. 107–08].  Regarding hypertension as an actual disability, Plaintiff's medical records from Kaiser reveal that his blood pressure readings in and around March 2015 fluctuated greatly but barely crossed the systolic threshold of 140.[18]  For example, on October 13, 2014, Smart's last three blood pressure readings were: 116/76 on October 13, 135/86 on October 2, and a second October 2nd reading of 142/98.  [Doc. 52-5, Exhibit 4 at 116].  On February 5, 2015, Plaintiff's most recent blood pressure readings were: 124/92 on January 15, 2015, 118/90 on January 26, 2015, and 147/100 on February 5, 2015.  [Doc. 52-5, Exhibit 4 at 160].  Finally, on March 17, 2015, Smart's blood pressure was 122/80 – below pre-hypertension stage. [Dr. Roaf Dep., Pl. Exhibit 4; Smart Dep. 66–68].

_____

[18] Nurse Bailey testified that a blood pressure reading of 140/90 is the standard for a diagnosis of elevated blood pressure or hypertension or high blood pressure. [Bailey Dep. 24–25].  Bailey explained that the top number in the reading is systolic or when the heart is beating and the bottom number is the diastolic or when the heart is at rest and that if either of these numbers is elevated, it can indicate a problem. [Bailey Dep. 38].

Moreover, Smart testified that, since he had been taking medication, he was not limited or restricted by his hypertension in his driving, reading, taking care of himself on a day-to-day basis, taking care of his daughter on a day-to-day basis, doing chores or activities around the home, and likewise not affected in his sleeping.  [Smart Dep. 108].    Even  so,  there  is  no  evidence  that  without  medication  Plaintiff  was "substantially limited" as a result of his hypertension.  And DeKalb records indicate that Smart successfully demonstrated that his hypertension was under control.  [Bailey Dep. 35–36, Exhibit 5 (hypertension not listed as an obstacle to Smart's return to work)].

For these reasons, Plaintiff is unable to show that his hypertension "substantially limits" a major bodily function or major life activity.  See 42 U.S.C. § 12102(1); 29 C.F.R. § 1630.2(i)(1)(ii).

### c.    Major Life Activity – Working

Plaintiff also contends, albeit somewhat halfheartedly, that he is substantially limited in the major life activity of working because after failing the CDL physical

46

exam he was precluded from all jobs requiring a Class A or Class B CDL.[19] [Doc. 52-1 at 4–5].

To be substantially limited in the major life activity of working, Plaintiff must show that he is "'significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities.'" Carruthers v. BSA Advertising, Inc., 357 F.3d 1213, 1216 (11th Cir. 2004) (quoting 29 C.F.R. § 1630.2(j)(3)(i)); see also D'Angelo v. ConAgra Foods, Inc., 422 F.3d 1220, 1227 (11th Cir. 2005). Notably, in enacting the ADAAA, discussion specifically regarding the major life activity of working and what constitutes a substantial restriction on an individual's ability to work was removed from the statutory text and this finding was described as occurring only in "rare cases[.]" Gonzalez v. Texas Health and Human Services Comm'n, 2014 WL 6606629, at *7 (W.D. Tex. November 19, 2014) (citing 29 C.F.R. § 1630, App., Interpretive Guidance on Title I of the ADA (2014)). As explained by the Interpretive Guidance, "this change was implemented because generally, a disability that

---

[19] This issue is given little attention by either of the parties, and the Court likewise finds that it warrants only brief mention.

47

substantially limits an individual from working, 'usually substantially limits one or more other major life activities.'" Id. (citation omitted).

In support of this theory, Plaintiff points to the Defendant's requirement that Equipment Operators (Eos, EOSs & EOPs), Crew Supervisors, and Construction Supervisors have a Class A CDL and CDL physical examination. [Owens Dep. 88]. Plaintiff Smart contends that in addition to being precluded from these types of jobs with DeKalb, that he was also precluded from applying for these types of jobs with other employers and all classes of jobs that require a Class A or Class B CDL and CDL physical exam. [Doc. 52-1 at 4 (citing Exhibit 44)].   Smart asserts that he was precluded from the time that he failed his CDL physical exam on March 12, 2015, until he obtained the Modi CDL physical card in June 2015 – a period of only two and a half months.   Plaintiff identifies all interstate trucking jobs as a class of jobs that he would be precluded from.  [Doc. 52-1 at 4].  However, Plaintiff presents no evidence that his failure to pass the CDL physical exam rendered him "unable to perform either a class of jobs or a broad range of jobs in various classes" as compared to an average person with comparable training, skills, and abilities. See, e.g., Hetherington, 511 Fed. Appx. at 912.  Plaintiff also only claims that he was "substantially limited" in the major life activity of working for a period of two and a half months.  And the duration of the

48

impairment is an appropriate consideration.  See Shepard, 470 Fed. Appx. at 729 (citation omitted).  More importantly, the Court finds that Plaintiff fails to meet his burden on this issue for the reasons already discussed in connection with his other claims of actual disability, namely, his inability to show that he is substantially limited.

In sum, a reasonable jury could not examine these facts and conclude that Plaintiff's glaucoma or hypertension "substantially limits" a major bodily function or a major life activity.  See 42 U.S.C. § 12102(1); 29 C.F.R. § 1630.2(i)(1)(ii).  Plaintiff, therefore, is unable to show that he has an actual disability.[20]

### ii.    A Reasonable Jury Could Find Plaintiff Was "Regarded As" Disabled

Although Plaintiff is unable to establish that he has an actual disability or a record of a disability, he may still satisfy the disability requirement of the ADAAA if he is able to show that he was "regarded as" disabled.  42 U.S.C. § 12102(1)(C).  "An individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment

---

[20] As discussed *supra*, since Plaintiff is unable to show that he's actually disabled, the record of impairment theory fails as well. See Hetherington, 511 Fed. Appx. at 913.

49

whether or not the impairment limits or is perceived to limit a major life activity."[21]

42 U.S.C. § 12102(3)(A). "The relevant inquiry in such cases is not the plaintiff's

actual condition, but how the Defendant 'perceived [his] condition, including the

reactions and perceptions of the persons interacting with or working with him.'"[22]

E.E.O.C. v. American Tool & Mold, Inc., 21 F. Supp. 3d 1268, 1275 (M.D. Fla. 2014)

(citation omitted). "Moreover, the 'regarded as' analysis is separate from whether the

employer can eventually establish a defense to the action[.]"[23] Id. at 1275–76 (citation

---

[21] An individual, however, will not be able to meet the requirement of being "regarded as" disabled if his impairment is "transitory and minor. A transitory impairment is an impairment with an actual or expected duration of 6 months or less." 42 U.S.C. § 12102(3)(B). Plaintiff's history of glaucoma dated back ten (10) years, and neither party addresses or argues the transitory aspect of Plaintiff's impairment during the relevant time period.

[22] The appendix to the rules explains:

> To illustrate how straightforward application of the "regarded as" prong is, if an employer refused to hire an applicant because of skin graft scars, the employer has regarded the applicant as an individual with a disability. Similarly, if an employer terminates an employee because he has cancer, the employer has regarded the employee as an individual with a disability.

29 C.F.R. § 1630, App. 3.

[23] "[F]or example, an employer who terminates an employee with angina from a manufacturing job that requires the employee to work around machinery, believing that the employee will pose a safety risk to himself or others if he were suddenly to

omitted); accord Lewis v. City of Union City, 877 F.3d 1000, 1012 (11th Cir. 2017) (clarifying that for purposes of the "regarded as" disabled prong, an employer's defense to its adverse employment action, such as a safety concern, is a separate inquiry).

Discussing ADA guidance, the Eleventh Circuit recently explained that when an employer takes an adverse action because it fears the consequences of an employee's medical condition[, it] has regarded that employee as disabled." Lewis, 877 F.3d at 1012 (citing 29 C.F.R. § Part 1630, App.) (rejecting defendant's argument as that placement of employee on administrative leave due to physician's letter recommending no exposure to OC spray or Taser shock could be divorced from its perception or belief that plaintiff suffered from a physical impairment as "difficult to credit" and explaining that defendant's argument "could do no more than raise an issue of fact" on perceived disability claim). And the Court here finds that a jury would be entitled to find that the Defendant DeKalb placed Plaintiff Smart on refrain from duty status because it regarded him as disabled.

---

lose consciousness, has regarded the individual as disabled. Whether the employer has a defense (e.g., that the employee posed a direct threat to himself or coworkers) is a separate inquiry." American Tool & Mold, Inc., 21 F. Supp. 3d at 1276 (quoting 29 C.F.R. § 1630, App. 3).

51

To meet the "regarded as" requirement for establishing a disability, Plaintiff Smart must show that Defendant DeKalb subjected him to a prohibited action "because of" his physical impairment, that is, his glaucoma / hypertension.  See 42 U.S.C. § 12102(3)(A).   "Prohibited actions include but are not limited to refusal to hire, demotion, placement on involuntary leave, termination, exclusion for failure to meet a qualification standard, harassment, or denial of any other term, condition, or privilege of employment. . . ."  29 C.F.R. § 1630.2(l)(1).

Defendant took a prohibited action against Plaintiff when the County placed him on refrain from duty status in March 2015.  The record establishes that DeKalb placed Plaintiff Smart on refrain from duty status because he failed his CDL physical exam and was deemed by Caduceus to be "Disqualified/Off Work" due to "glaucoma / hypertension."  [Bailey Dep. 21, Exhibits 1, 3, 15 – Response 3].  This measure was akin to placing an employee on an involuntary leave or exclusion for failure to meet a qualification standard, see § 1630.2(l)(1), and precluded Plaintiff Smart from working.  The remaining issue is whether Defendant placed Plaintiff on leave "because of" his glaucoma / hypertension.  42 U.S.C. § 12102(3)(A).

The Court also finds that a reasonable jury could conclude that Defendant placed Plaintiff on refrain from duty status "because of" a disability or perceived disability.

52

42 U.S.C. § 12102(3)(A). Defendant appears to contend that it cannot be held responsible for the actual medical findings of Caduceus and that Defendant's knowledge of Plaintiff's medical condition was indirect at best.[24] Defendant argues that there is no evidence that DeKalb itself ever reviewed Plaintiff's medical records such that Defendant could regard Plaintiff as disabled. [Doc. 72 at 6]. The Court is not persuaded and finds at minimum that a genuine issue of material fact exists as to applicability of the "regarded as" disabled definition. See Smith-Jackson v. Chao, 2017 WL 3575003, at *5 (N.D. Ga. August 18, 2017) ("'If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial.'") (quoting Herzog v. Castle Rock Entertainment, 193 F.3d 1241, 1246 (11th Cir. 1999)).

The record reveals that Defendant DeKalb hired Caduceus and made the medical findings of Caduceus its own. This is exhibited in the testimony of Nurse Bailey and her successor Hudson. Bailey explained that she would have received the Caduceus file on Smart electronically once uploaded by Caduceus and, as a matter of practice, would have reviewed Smart's entire file to confirm the reason provided by Caduceus

---

[24] Defendant's statement within its memorandum of law in support of its motion for summary judgment that "Plaintiff was refrained from duty because he had been disqualified from work *not based on a disability*" is disingenuous. [Doc. 66-2 at 21]. Speaking to his initial request to return to work, Smart testified that Caduceus advised him that "it was up to the county[.]" [Smart Dep. 85].

for failing the exam. [Bailey Dep. 19–20]. As highlighted by Plaintiff's counsel, Bailey was knowledgeable and familiar with Smart's medical diagnoses and potential effects of both.[25] While Bailey was the DeKalb employee tasked with making the refrain from duty decision, she was not the only DeKalb employee with knowledge of the Caduceus findings.[26] [Bailey Dep. 31]. In addition to notifying Roads and Drainage Administrative Service Manager Leo Owens, Bailey testified that she sent Smart's information, namely, a cover sheet for Caduceus and memo explaining Caduceus's findings (and what the employee's private physician will need to be able to return to duty), to Peggy Allen, the Associate Director of Roads and Drainage and

---

[25] Bailey defined glaucoma as "a narrowing of the vision due to increased pressure in the eye[.]" [Bailey Dep. 24]. Bailey agreed that glaucoma can result in limited vision and testified that glaucoma could "cause someone to have tunnel vision, not being able to see in the periphery, only being able to see straight ahead[,]" and that "[t]here are different levels of the disease[.]" [Bailey Dep. 24].

[26] This is true notwithstanding Bailey's restrictions under HIPPA regulations. Bailey was not allowed to send medical information directly to the Roads and Drainage department due to HIPPA regulations. [Bailey Dep. 21]. As a result, Roads and Drainage did not receive any medical information in March 2015 from Bailey about why Smart was refrained from duty. [Bailey Dep. 21; Allen Dep. 28–29, 83–84; Deposition of Andra Thompson ("Thompson Dep.") 54]. Plaintiff emphasizes that Roads and Drainage possessed Plaintiff's medical records and that Leo Owens was aware that Plaintiff had a vision problem and the department possessed records documenting Plaintiff's "severe glaucoma," related procedures, as well as various medical appointments. [Owens Dep. 12, 18–25; Harkles Dep. 41, Pl. Exhibit 2].

54

Owens' supervisor, because there was some question about why Smart was refrained.[27] [Bailey Dep. 22, Exhibit 2].  Although made aware that Smart had been placed on refrain from duty status earlier, Allen testified that she learned in June 2015 from Bailey and from her review of Smart's medical records forwarded to her by Bailey that Plaintiff Smart was on refrain from duty status because of "a vision issue" and that Smart suffered from glaucoma. [Allen Dep. 29–32].   As a result, the Court finds that Plaintiff has presented sufficient evidence from which a jury could reasonably infer that Plaintiff was regarded as disabled by Defendant DeKalb.  See, e.g., Azzam v. Baptist Healthcare Affiliates, Inc., 855 F. Supp. 2d 653, 661 (W.D. Ky. 2012); accord Harty v. City of Sanford, 2012 WL 3243282, at *5 (M.D. Fla. August 8, 2012) (holding that evidence the employer knew of the plaintiff's restrictions and "'asked [him] to resign because of [his] restrictions'" was sufficient to establish that the employer regarded the plaintiff as disabled) (citation omitted).

---

[27] Peggy Allen was not a medical provider and did not have the discretion or ability to override the refrain from duty determination.

55

For these reasons, Defendant's decision to place Smart on refrain from duty status following his CDL physical exam is a sufficient basis for finding that Defendant regarded Plaintiff as disabled due to his glaucoma / hypertension.[28]

The Court finds that Plaintiff Smart satisfies the first *prima facie* element, namely, to show that he had a disability as it is defined under the ADA.

### 2. Genuine Issues Of Material Fact Exist As To Whether Plaintiff Can Demonstrate He Was A "Qualified Individual"

With regard to the second *prima facie* element, Defendant argues that Plaintiff fails to produce evidence establishing that he is a "qualified individual."  The ADA defines the term "qualified individual" as follows:

> The term "qualified individual" means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.  For the purposes of this subchapter, consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job.

42 U.S.C. § 12111(8).  "Accordingly, an ADA plaintiff must show either that he can perform the essential functions of his job without accommodation, or, failing that,

---

[28] As noted, concerns surrounding Plaintiff Smart's hypertension were resolved early on and were not a continuing basis for Smart's refrain from duty status.

56

show that he can perform the essential functions of his job with a reasonable accommodation." D'Angelo, 422 F.3d at 1229 (citation and internal quotation marks omitted). The relevant time period for evaluating whether an individual is "qualified" is at the time of termination.[29]   See Paleologos, 990 F. Supp. at 1466 (summary judgment granted in favor of defendant where plaintiff could not show she was a qualified individual).

### a.   Essential Function

"An essential function is a fundamental job duty of a position, and does not include marginal functions of the position." Mason v. United Parcel Service Co. Inc., 674 Fed. Appx. 943, 951 (11th Cir. 2017) (citing Earl v. Mervyns, Inc., 207 F.3d 1361, 1365–66 (11th Cir. 2000)). "[A] job function may be considered essential because the very reason the position exists is to perform that function." Vincent v. Wells Fargo Guard Services, Inc., 3 F. Supp. 2d 1405, 1416 (S.D. Fla. 1998) (providing examples of essential job functions of different types of positions, including that an essential job function of a bus driver is the ability to distinguish between red, yellow, and green). "Determining whether a particular job duty is an essential function involves a factual

_____

[29] In this case, because Plaintiff was not terminated, the Court looks to the date Smart was told he was being placed on refrain from duty status and could not work.

57

inquiry to be conducted on a case-by-case basis." Anderson v. Embarq/Sprint, 379 Fed. Appx. 924, 927 (11th Cir. 2010) (citing Holly, 492 F.3d at 1258)); accord Spears v. Creel, 607 Fed. Appx. 943, 949 (11th Cir. 2015) (quoting Davis v. Florida Power & Light Co., 205 F.3d 1301, 1305 (11th Cir. 2000)).

In determining which functions are essential, "[c]ourts consider the employer's judgment . . . as well as (1) the amount of time spent on the job performing the function, (2) the consequences of not requiring the individual to perform the function, (3) the terms of a collective-bargaining agreement, (4) the work experience of individuals who held the job in the past, and (5) the work experience of individuals currently in similar jobs."[30] Anderson, 379 Fed. Appx. at 927–28 (citing Holly, 492 F.3d at 1257–58); and see Paleologos, 990 F. Supp. at 1466; see also Spears, 607 Fed. Appx. at 950 (same).

By definition, one aspect of the qualified individual inquiry is whether or not an employee could have been qualified and able to perform essential job functions if afforded reasonable accommodation. See 42 U.S.C. § 12111(8); and see D'Angelo, 422 F.3d at 1229; Earl, 207 F.3d at 1367; see also Stewart v. Happy Herman's

---

[30] There is no evidence of any collective bargaining agreement that affected the Construction Supervisor position and duties.

Cheshire Bridge, Inc., 117 F.3d 1278, 1286 (11th Cir. 1997).  If a plaintiff cannot

perform essential functions of his job, even with a reasonable accommodation, then he

is not a "qualified individual" and is unable to establish a *prima facie* case.  See Davis,

205 F.3d at 1305; and see Jarvela v. Crete Carrier Corp., 776 F.3d 822, 828–31 (11th

Cir. 2015) (summary judgment granted in favor of defendant employer on ADA

discriminatory termination claim after evaluating employer's written job description,

including provision that driver must qualify under applicable DOT regulations, in

determining essential functions of job at the time of termination and holding that

plaintiff's then current clinical diagnosis of alcoholism meant plaintiff could not

qualify as a commercial motor vehicle driver under DOT regulations and thus was

unable to perform essential functions).

The analysis in  Toole v. Metal Services LLC, 17 F. Supp. 3d 1161 (S.D. Ala.

May 2, 2014), although factually inapposite, is instructive on this issue.[31]  In Toole, the

---

[31] The critical factual differences between the record here and in Toole are that
Toole involved consideration of a newly created position with no written job
description; and the only evidence describing the plaintiff's duties and responsibilities
were the discussions had between Toole and the defendant prior to Toole being offered
the position.  See id. at 1172–73.  In addition, in Toole, the defendant-employer
presented evidence that, relevant to "the current work experience of employees in
similar jobs" and "the amount of time spent on the job performing the function", the
successful candidate hired to replace Toole asserted by declaration that he had a
number of duties requiring him to "drive commercial motor vehicles and / or non-

plaintiff was offered a newly created position with the defendant as a Safety Trainer and had the job offer withdrawn after plaintiff, who had monocular vision, failed to pass the CDL physical examination.  The district court found that a genuine issue of material fact existed as to whether or not plaintiff was a "qualified individual" for the safety position and denied summary judgment.  Id. at 1173–74.

Here, the dispositive issue is whether having and maintaining a valid CLASS A CDL, which allowed for full driving privileges with respect to commercial vehicles, was an essential function of the Construction Supervisor job.[32]  The undersigned considers the employer's judgment and the other relevant factors, including the amount of time Plaintiff Smart spent on the job utilizing his Class A CDL as Construction Supervisor, the consequences of not requiring Smart possess a Class A CDL and to perform commercial driving, and other relevant evidence.  See Anderson, 379 Fed.

---

commercial motor vehicles on-site and / or off-site" and that "he did so 456 of the 616 days he has served as Safety Trainer between April 18, 2011, and January 7, 2014." Id. at 1173 (citation omitted).

[32] Plaintiff's suggestion that the CDL requirement is more akin to a qualification standard as opposed to what the employee is required to do with the CDL seems to be a distinction without a difference in the instant case because both contemplate the availability of an affirmative defense.  [Doc. 71 at 6–7 (recognizing that DeKalb can impose a qualification standard provided it is job-related and consistent with a business necessity)].

AO 72A
(Rev.8/82)

Appx. at 927–28 (citing Holly, 492 F.3d at 1257–58).  Having considered the evidence of record, the Court finds this issue properly left to the fact-finder.

### i.      Employer's Judgment / DeKalb Written Materials

Substantial weight is given to the employer's judgment concerning the essential functions of the Construction Supervisor position.  See Holly, 492 F.3d at 1258 ("entitled to substantial weight in the calculus"); accord Mason v. United Parcel Service Co. Inc., 674 Fed. Appx. 943, 951 (11th Cir. 2017) (citing Holly, 492 F.3d at 1258).

It is the judgment of Defendant DeKalb County that possessing a Class A CDL is an essential job function for a Construction Supervisor.  [Doc. 66-2 at 17–20; Doc. 70 at 9–10].  Defendant asserts that CDL licensure is critical during emergencies because emergencies require operating heavy equipment, heavy material, and getting heavy equipment and material to the job site.  [Allen Dep. 75, 78–79].  Defendant's judgment on the matter is not determinative.  See Holly, 492 F.3d at 1258; see also Toole, 17 F. Supp. 3d at 1172 (quoting Holly, 492 F.3d at 1258 (explaining how allowing an employer's judgment to be conclusive could result in manipulation of the statute)).   The Defendant's written materials provide support for both of the parties' legal positions.

61

As noted previously, Plaintiff Smart's job application for the Construction Supervisor position inquired about CDL. Without conceding that he "needed to have a CDL for the position" and without conceding that a CDL is an essential requirement of the Construction Supervisor job, Smart agreed in his deposition with the proposition that, in light of the fact that the job applications ask about a valid commercial driver's license, the successful candidate / applicant "would be required to perform some commercial driver's license work." [Smart Dep. 24].

Relevant to the Construction Supervisor position, DeKalb County promulgated a Classification Specification in 2007 ("2007 Classification") stating that a minimum requirement for the position is to possess and maintain a CDL. [Bailey Dep. 61; Allen Dep. 70, 75, Pl. Exhibit 10]. The 2007 Classification provides that transporting heavy equipment and / or materials to the job sites is an essential function of the position. [Allen Dep. 70, Pl. Exhibit 10].

In 2012, DeKalb County published a Roads and Drainage Job Description ("2012 Job Description") for the Construction Supervisor (also known as Construction Foreman) position.[33] [Pl. Exhibit 21]. The 2012 Job Description for Construction

---

[33] Plaintiff contends that the 2012 Job Description superseded the 2007 Classification Specification such that the CDL requirement was impliedly eliminated. Plaintiff Smart also contends that the 2007 Classification Specification does not

Supervisor provides that the employee holding this position is to "[m]aintain a Class A CDL license during the rated period." [Smart Dep. 29, Def. Exhibit 9 at 4; Allen Dep. 80, Pl. Exhibit 4].  Smart understood that for each one year "rated period" (i.e., June 4th of one year to June 4th of the next year), he was required to maintain a CDL and that this requirement was in effect for each year that he held the position of Construction Supervisor.  [Smart Dep. 29].  The Job Description also makes clear that the primary duty of the position is to supervise and the delegation of duties is promoted.[34] [Allen Dep. 94–95, Exhibit 4, ¶ 3a].

_____

control here because it post dates the commencement of Plaintiff's employment as Construction Supervisor in June 2006.

[34] Under the subheading "Work Delegation" the Job Description provides in part:

> A Construction Foreman must properly delegate responsibility to his crew to accomplish assigned work.

> A Construction Foreman must insure that he supervises the crew rather than do the work himself.  It will often be necessary for the Construction Foreman to step in and perform the function of an absent crew member, such as operating equipment or driving a truck, but *by and large, a Construction Foreman's first responsibility is proper supervision of the crew*.

[Pl. Exhibit 4, ¶ 3a (emphasis added)].

AO 72A
(Rev.8/82)

The 2012 Job Description also provides that as a condition of employment, the Construction Supervisor agrees to work unscheduled overtime under emergency conditions as "DIRECTED." [Allen Dep. 81, Pl. Exhibit 4 at 5 (emphasis in original)]. With respect to the role of Construction Supervisors when called upon to perform emergency functions, there is conflicting record evidence. [Allen Dep. 78–79; Smart Dep. 159, 186; Smart Decl. ¶ 12].

While Defendant's position is that the CDL was an essential job function for Constructions Supervisors, the existence of conflicting employer documents weigh in favor of finding summary judgment disposition is inappropriate.   Beyond the competing DeKalb materials, however, there is also conflicting evidence regarding the necessity of the Construction Supervisor to be able to *personally* drive commercial vehicles on the job or during an emergency situation.

### ii.      Time Actually Spent On The Job

Plaintiff Smart contends that he did not, as a matter of his regular job duties, personally haul heavy equipment or material to road construction work sites and that much of the construction equipment used by road construction crews do not require a commercial drivers license to lawfully operate.  [Doc. 52-1 at 17–18; Smart Dep. 158, 163].  To contrast, Smart testified that before becoming a Construction Supervisor,

64

when he was a Crew Supervisor, he had access to and occasionally drove a crew truck, a pickup truck, a dump truck, and a Dooley pickup truck and that the crew truck and dump truck required a CDL. [Smart Dep. 135–36].  As explained by Smart, the Crew Supervisor was responsible for overseeing the crew and the Construction Supervisor was responsible for overseeing "the job itself."  [Smart Dep. 136].  When Smart was a Crew Supervisor, the Construction Supervisor he worked under did not perform any manual work on the job site.  [Smart Dep. 136–37].  Smart described the Construction Supervisor role as filling out paperwork and taking measurements. [Smart Dep. 137–38].  A typical day as Construction Supervisor would begin with explaining the task at hand once on the job site and delegating folks to their prospective jobs and then getting back in the truck and completing paperwork.  [Smart Dep. 139].

During Smart's tenure as Construction Supervisor, he relied on employees to "transport[ ] heavy equipment" to the job sites and if he ever drove any equipment to the site, it was a "rare occasion[.]"  [Smart Dep. 158, 179–80, 182–83].  According to Smart, as a supervisor, he had members of his crew drive commercial vehicles "all the time on a constant basis" and "[i]f . . . it was a situation where we couldn't drive or didn't feel like driving, . . . we could delegate someone on the crew to drive as long as it didn't impact the crew[.]"  [Smart Dep. 126–27].

65

In fact, Smart's crew was assigned a pickup truck that allowed for him to drive it every day if he chose. [Smart Dep. 127].  Smart stated that he would regularly drive the pickup truck to the job site and meet his crew there after collecting paperwork or material from Roads and Drainage. [Smart Dep. 127].   Having access to the pickup truck also provided Smart with the ability to go out and survey other job sites without interfering with the crew's work at the current job site.  [Smart Dep. 128]. Smart typically drove the pick up truck when on emergency duty.  [Smart Dep. 159].

### iii.    Consequences Of Not Performing Function

Similarly, the parties (and even Defendant's own witnesses) have differing views about the role of a Construction Supervisor as being responsible for the crew's use of large trucks, crew cabs, trucks with trailers, dump trucks, and large resurfacing vehicles to transport heavy equipment and materials to job sites versus the need for the Construction Supervisor to personally carry out these tasks.  [Doc. 52-1 at 18–19; Allen Dep. 74 (use); Brooks Dep. 11–12 (responsible for)].

As previously noted, Smart testified that he was encouraged to delegate and that driving heavy equipment was one of the tasks he delegated often.  [Smart Dep. 126–27]. Smart also contends that delegating commercial driving to his crew members did not negatively impact the performance of the crew's other duties because "unless

66

you were driving a dump truck that [he] needed to use on the job site that day, all you would do is drive out to the job site, park, get out, and perform the job." [Smart Dep. 128]. During 2014 and 2015, Smart estimated that "four or five" of his crew members with CDLs would have been available to drive the crew truck for him and still been able to perform their jobs. [Smart Dep. 128–29].

### iv. Other Work Experience – Past / Similar Jobs

As for the work experience in similar jobs, Smart testified that while he was a Construction Supervisor, he spent up to forty or fifty percent of his time substituting or standing in for various General Foremen. [Smart Dep. 139–40]. In that role, Plaintiff would go to the front office, get the paperwork together, see what each crew had to do for the day, let each supervisor know what they had to do for the day, send the crews out, complete unfinished paperwork or put data (asphalt numbers) in the computer, and then go out in the pickup truck and check on the crews at each individual job site. [Smart Dep. 140–41]. Driving the pickup truck did not require a CDL. [Smart Dep. 141].

Having considered the pertinent factors, the Court finds that Plaintiff produces sufficient evidence creating a genuine issue of material fact regarding whether having

a Class A CDL was an essential function of Plaintiff Smart's job as Construction Supervisor.[35]

### 3.    Disability Discrimination

The final element necessary to establish a *prima facie* case under the ADA requires Plaintiff to show that he was discriminated against *because of his disability*. See Mazzeo, 746 F.3d at 1268 (emphases provided); and see Mattingly v. University of South Florida Bd. of Trs., 931 F. Supp. 2d 1176, 1181–82 (M.D. Fla. 2013). "Under the ADA, there are two distinct categories of disability discrimination: (1) disparate treatment and (2) failure to accommodate." Toliver v. City of Jacksonville, 2017 WL 1196637, at *5 (M.D. Fla. March 31, 2017) (citing Holly, 492 F. 3d at 1261–62); see also Mattingly, 931 F. Supp. 2d at 1182 (plaintiff may satisfy third *prima facie* element by alleging facts showing intentional discrimination, disparate

---

[35] Notwithstanding the essential function analysis, Plaintiff Smart asserts that he should be found a qualified individual under the statute because state law provided Plaintiff with alternative avenues for securing a CDL. [Doc. 52-1 at 8–11].  To summarize, Plaintiff relies upon federal regulations and State of Georgia rules applicable to CDL holders for the proposition that the Defendant DeKalb County could not lawfully require a driver such as Plaintiff Smart, who drives commercial vehicles within the county only for work, to maintain and test for the Class A CDL without running afoul of federal and state law. [Id.].  Because the Court has already determined the qualified individual issue to fall within the province of the jury, assuming the presiding District Judge entertains this aspect of Plaintiff's qualified individual legal argument, the Court finds it is likewise for the jury.

treatment, or failure to make reasonable accommodations) (citing Rylee v. Chapman, 316 Fed. Appx. 901, 906 (11th Cir. 2009)); and see 42 U.S.C. § 12112(b)(5)(A) (failure to make reasonable accommodations included within ADA's definition of discrimination).

The Court analyzes Plaintiff's failure to accommodate claim first.

### a.    Failure To Provide Reasonable Accommodation

Plaintiff contends that Defendant DeKalb engaged in disability discrimination in violation of the ADA by failing to provide a reasonable accommodation to his disability (or perceived disability). Defendant contends that Plaintiff fails to identify any specific request for accommodation.

As discussed *supra*, disability discrimination under the ADA encompasses an employer's failure to make reasonable accommodations for the limitations of an individual with a disability. See 42 U.S.C. § 12112(b)(5)(A). "Thus, an employer's failure to reasonably accommodate a disabled individual *itself* constitutes discrimination under the ADA, so long as that individual is 'otherwise qualified,' and unless the employer can show undue hardship."[36] Holly, 492 F.3d at 1262 (emphasis

---

[36] As such, the burden-shifting framework set forth in McDonnell Douglas, 93 S. Ct. at 1824–25, which is used as a mechanism for evaluating other types of ADA claims challenged at summary judgment, does not apply to reasonable accommodation

in original); and see McKane v. UBS Financial Services, Inc., 363 Fed. Appx. 679, 681 (11th Cir. 2010) (recognizing an employer's failure to provide reasonable accommodation as the third *prima facie* element in ADA failure to accommodate claim and one way a plaintiff can show disability discrimination, and granting summary judgment in favor of defendant employer where plaintiff was unable to show that requested accommodation was reasonable) (citing Lucas v. W.W. Grainger, Inc., 257 F.3d 1249, 1255 (11th Cir. 2001)).

"An accommodation is 'reasonable' and necessary under the ADA only if it enables the employee to perform the essential functions of the job." Lucas, 257 F.3d at 1259–60; and see Holly, 492 F.3d at 1256 (citation omitted). "The burden of identifying an accommodation that would allow a qualified employee to perform the essential functions of [his] job rests with that employee, as does the ultimate burden of persuasion with respect to showing that such accommodation is reasonable." Earl, 207 F.3d at 1367; see also Stewart, 117 F.3d at 1286; accord Gilliard v. Georgia Dep't

claims.  See Nadler v. Harvey, 2007 WL 2404705, at *8 (11th Cir. August 24, 2007) ("An employer *must* reasonably accommodate an otherwise qualified employee with a *known* disability unless the accommodation would impose an undue hardship in the operation of the business. . . . Thus, applying McDonnell Douglas to reasonable accommodation cases would be superfluous, since there is no need to prove discriminatory motivation.") (emphasis in original).

of Corrections, 500 Fed. Appx. 860, 868 (11th Cir. 2012) (applying Stewart).

"Moreover, an employer's duty to provide a reasonable accommodation is not

triggered unless a specific demand for an accommodation has been made."

Frazier-White v. Gee, 818 F.3d 1249, 1255–56 (11th Cir. 2016) (citation and internal

quotation omitted); accord Cazeau v. Wells Fargo Bank, N.A., 614 Fed. Appx. 972,

982 (11th Cir. 2015); see also Spears, 607 Fed. Appx. at 948.

As relevant in this case, "reasonable accommodation" may include "job

restructuring, part-time or modified work schedules, reassignment to a vacant position,

. . . and other similar accommodations for individuals with disabilities." 42 U.S.C.

§ 12111(9)(b); see also Terrell v. USAir, 132 F.3d 621, 626 (11th Cir. 1998) (inclusion

of a particular type of accommodation in the ADA does not mean that the

accommodation is automatically deemed "reasonable"). However, "an employer is not

required to create and fund a position as an accommodation, nor must an employer

reallocate job duties that would alter the essential function of a job." Medearis v. CVS

Pharmacy, Inc., 646 Fed. Appx. 891, 895 (11th Cir. 2016) (citations omitted) (affirming

summary judgment in favor of employer on ADA failure to accommodate claim where

plaintiff employee was unable to demonstrate he could perform essential functions of

job, which included the ability to lift more than 10 pounds, with or without reasonable

71

accommodation).  Whether an accommodation is reasonable depends upon the specific facts and circumstances of the case.  Stewart, 117 F.3d at 1285; and see Frazier-White, 818 F.3d at 1255–56 (noting in summary judgment analysis that reasonable accommodation depends on the circumstances; "[g]enerously construing [plaintiff's] communications to Defendant" to ascertain terms of proposed accommodations); see also Markwart v. United Parcel Service, Inc., 2013 WL 3864347, at *3–4 (M.D. Fla. July 24, 2013).  To be sure, "[a]n employee with a disability is not entitled to the accommodation of his choice, but only to a reasonable accommodation."  McKane, 363 Fed. Appx. at 681 (citing Earl, 207 F. 3d at 1367); see also Stewart, 117 F.3d at 1285 (employer is not required to provide an employee with "'the maximum accommodation or every conceivable accommodation possible'") (quoting Lewis v. Zilog, Inc., 908 F. Supp. 931, 947 (N.D. Ga. 1997)).

Here, Plaintiff Smart asserts that he made two specific requests for accommodation shortly after being placed on refrain from duty status.  They are discussed in turn.  First, Smart contends that he met with Leo Owens a few weeks afterwards and proposed that he be allowed to work without having to drive and offered to work as a crew worker.  According to Plaintiff:

72

> I went up to the job.  I saw that [Leo] was in his office.  I walked in his office and I spoke with him and I asked him, I said, Leo, I need to come back to work.  Even if it means not driving a county vehicle.  Like I said and I stated to him, I've been here long enough I don't have to drive.  I mean if I need to grab a shovel and be a crew worker, I can do that and he told me he couldn't let me return to work until I passed a physical because my job required a CDL physical.

[Smart Dep. 14–23].  According to Smart, he told Owens that he did not need to drive a county truck and was willing to return to work as a crew worker – how Plaintiff began his career with the county in 1995 – because he needed to come back to work. [Smart Dep. 131].  Defendant points to the testimony of Owens who testified that he did not recall Plaintiff making any specific request to return to work without doing any driving and did not remember Plaintiff ever speaking with him in person.  [Owens Dep. 17].  According to Owens, that sort of request would have had to been made to the Director. [Owens Dep. 17–18].  Allen, the most senior person in Roads and Drainage at the time, was next in line because the Director position was vacant, and Allen testified that she was never asked and thus never even considered whether or not Plaintiff Smart might be able to return to work and do his supervisory job without actually driving a truck. [Allen Dep. 36–37, 86].

Under the ADA, a transfer to another position may constitute a reasonable accommodation.  See 42 U.S.C. 12111(9) ("The term 'reasonable accommodation'

may include . . . (B) . . . reassignment to a vacant position."); accord Smith-Jackson v. Chao, 2017 WL 4546125, at *14–15 (N.D. Ga. July 5, 2017) (discussing evaluation of requested transfer as a reasonable accommodation and noting that the reasonableness inquiry is "heavily dependent on the circumstances"), report and recommendation adopted by 2017 WL 3575003 (N.D. Ga. August 18, 2017). "At the summary judgment stage, an employee meets [his] burden by showing an accommodation that 'seems reasonable on its face.'" Smith-Jackson, 2017 WL 4546125, at *14 (quoting U.S. Airways, Inc. v. Barnett, 122 S. Ct. 1516, 1521–22 (2002)). This fact-specific analysis must be made with reference to a specific, vacant position. See Frazier-White, 818 F.3d at 1256–57 (citation omitted) (noting plaintiff did not support her request for reassignment with evidence that there was "a specific, full-duty vacant position she was qualified for"). In this case, Plaintiff Smart asserts that during the relevant time period he learned that there was a vacant crew worker position that did not require a CDL license. [Doc. 52-26, Exhibit 26 – Crew Worker Job Bulletin, Open 3/10/15, Closes 3/12/15]. The existence of vacancies were confirmed by Allen, who testified that there were as many as five different vacancies in Paving, including a Crew Worker position. [Allen Dep. 63–64, Pl. Exhibit 9].

74

Plaintiff states that he proposed a second reasonable accommodation on June 26, 2016, when he presented a valid CDL physical card signed by Dr. Modi to Administrative Assistant Michelle Harkles and asked to return to work. [Smart Dep. 100, 148–49; Owens Dep. 20; Harkles Dep. 12]. Harkles rejected Smart's proposal and stated that the Modi CDL card could not be accepted because it was not from Caduceus. [Harkles Dep. 12–13; Allen Dep. 27–28]. Harkles testified that it was "a matter of policy" and that because "Caduceus was the [entity] that put [Smart] out on a refrain from duty, . . . they're the ones that have to bring him back in." [Harkles Dep. 12]. Peggy Allen, then the Associate Director of Roads and Drainage and a supervisor of both Owens and Harkles, testified that although Caduceus is the designated vendor, she does not know of anybody who has ever advised them to reject "non-Caduceus paperwork[.]" [Allen Dep. 12, 27–28].

There is a factual question regarding whether or not the Modi CDL physical card satisfied the Defendant's 1990 Policy allowing employees to use a non-county vendor to obtain CDL physical cards.[37] [Exhibit 20]. Defendant produces evidence, deposition

---

[37] Defendant contends in its filings, post-hoc, that the Modi medical card was irregular in several ways, including that Dr. Modi did not test Plaintiff for glaucoma and was not aware of Plaintiff's pending DOT vision exemption request. [Smart Dep. 90]. The Modi physical card did not include a check mark to indicate that Smart was wearing corrective lenses although Smart was, in fact, wearing corrective lenses during

75

testimony of Furlong, to the effect that the 1990 Policy did not allow a county driver who failed a CDL physical examination administered by DeKalb's third-party medical provider to obtain a CDL medical examiner's certificate card from his or her own doctor and instead only permitted the employee driver to *initially* go to a qualified medical provider for medical recertification testing or the DeKalb vendor.  [Furlong Rule 30(b)(6) Dep. 16, 32].  Plaintiff Smart disputes this contention and asserts that a plain reading of the 1990 Policy does not support the Defendant's interpretation. [Pl. Resp. DSMF 68].

The Court finds that Plaintiff presents evidence giving rise to a triable issue concerning whether or not Smart "identified [and proposed to Defendant] an accommodation that seems reasonable on its face . . . in the form of a reassignment to a vacant position . . . that would have allowed [him] to continue working for Defendant."[38]  Smith-Jackson, 2017 WL 4546125, at *15 (citations omitted).  And

---

the exam. [Smart Dep. 194]. Although Defendant proffers a number of reasons for its rejection of the Modi physical card, there is no evidence that Harkles relied on those irregularities at the time that she refused it.

[38] DeKalb would then bear the burden of establishing as an affirmative defense that the requested accommodation would result in undue hardship on the Defendant. See Willis v. Conopco, Inc., 108 F.3d 282, 286 (11th Cir. 1997) (explaining that "establishing that a reasonable accommodation exists is a part of an ADA plaintiff's case, whereas undue hardship is an affirmative defense to be pled and proven by an

because the Court has determined that genuine issues of material fact exist concerning whether or not Plaintiff was a qualified individual, the reasonableness of Plaintiff's request for accommodation cannot be decided as a matter of law. See Spears, 607 Fed. Appx. at 949 ("[T]he reasonableness of Spears's request for a non-shift, light-duty assignment depends on the essential functions of the job.").[39]

In support of his reasonable accommodation claim, Plaintiff Smart argues that DeKalb provided work for employees who lost driving privileges because of driving while under the influence or driving while impaired charges. [Smart Dep. 125–27; Brooks Dep. 109; Owens Dep. 105–06, Exhibit 41 at 4–5 (light duty), Exhibit 29]. Superintendent Brooks testified that those situations were evaluated on a case-by-case basis and decisions involved the Director's input and likely consultation with Human Resources and the employee's foreman, manager, and superintendent. Brooks stated that he was aware of certain instances where employees encountering CDL restrictions

_____

ADA defendant").

[39] If possession of the Class A CDL was found by a jury to be an essential function of the Construction Supervisor position, Defendant is not required to eliminate an essential job function or "to reallocate job duties in order to change the essential functions of a job." Id. On the other hand, if found to not be an essential function, a reasonable jury might find that Defendant's failure to investigate Plaintiff's request for accommodation further was unreasonable.

were both sent home and some who were allowed to continue working depending on the nature of the restrictions and the available work.  [Brooks Dep. 100–02].  As explained by Brooks, feasibility of accommodating any particular employee and restrictions would depend upon the scope of the work for any given day. [Brooks Dep. 103–05]. The most probative example of Defendant making an accommodation Brooks testified about was Derrick Reece ("Reece"), a Crew Supervisor who was required to possess and maintain a Class A CDL, who had seizures and was restricted from driving altogether.  [Brooks Dep. 116–17].  Brooks testified that Reece was permitted to continue working as a Crew Supervisor, a similar position one step below the Construction Supervisor position.  [Brooks Dep. 116–17 ("He supervised his crew. He just didn't drive.")].  The Court finds that Plaintiff has satisfied his burden of producing sufficient evidence from which a reasonable jury could find that Plaintiff's request for accommodation was reasonable.

The undersigned **RESPECTFULLY RECOMMENDS** that the parties' motions both be **DENIED** with respect to Plaintiff's disability discrimination claim alleging failure to accommodate.

78

**b.    Disparate Treatment**

In addition to alleging failure to accommodate, Plaintiff Smart alleges disability discrimination based upon disparate treatment.

"Liability in a disparate-treatment case depends on whether the protected trait . . . actually motivated the employer's decision." Raytheon Co. v. Hernandez, 124 S. Ct. 513, 519 (2003) (acknowledging that disparate treatment claims are cognizable under the ADA) (citation and internal quotation marks omitted).

In order to establish a pr*ima facie* case of disability discrimination based upon disparate treatment, Plaintiff must produce evidence showing that: 1) Plaintiff was a member of a protected class (i.e., disability); 2) Plaintiff was subjected to an adverse employment action; and 3) Plaintiff's employer treated similarly situated employees outside the protected class differently or more favorably.   See Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1087, 1091 (11th Cir. 2004) (Title VII action before the court on motion for summary judgment); accord Crawford v. Carroll, 529 F.3d 961, 970 (11th Cir. 2008) (same); and see Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997).

79

### i.     Disability

As previously discussed *supra*, the Court finds that a genuine issue of material fact exists as to whether Defendant DeKalb perceived or regarded Plaintiff Smart as disabled.

### ii.     Adverse Action

With respect to adverse action, the ADA prohibits discrimination "in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). "In interpreting these terms, conditions, and privileges, courts apply the same precedents used to analyze the adverse actions of Title VII claims." Hargett v. Florida Atlantic University Bd. of Trs., 219 F. Supp. 3d 1227, 1238 (S.D. Fla. 2016) (citing Doe v. DeKalb County School District, 145 F.3d 1441, 1447–48 (11th Cir. 1998)). In order "to prove adverse employment action . . . an employee must show a *serious and material* change in the terms, conditions, or privileges of employment." Davis v. Town of Lake Park, Fla., 245 F.3d 1232, 1239 (11th Cir. 2001) (emphasis in original).

Defendant's election to send Plaintiff home from work, in effect precluding Smart from earning due to being placed on refrain from work status, had significant

80

economic consequences for Smart and therefore qualifies as an adverse action for purposes of the ADA.

### iii.    Intentional Discrimination

The final *prima facie* element is that Plaintiff allege facts showing that DeKalb treated similarly situated employees outside the protected class (i.e., with no disability) differently or more favorably.   See <u>Wilson</u>, 376 F.3d at 1087; <u>accord</u>   <u>Wolfe v. Postmaster General</u>, 488 Fed. Appx. 465, 468 (11th Cir. 2012).   Defendant argues that Plaintiff cannot establish either that he was refrained from duty or not allowed to return to work in June 2015 (after presenting the Modi physical card) *because of a disability*. However, under the "regarded as" disabled prong, <u>see</u> 42 U.S.C. § 12102(3)(A), disability discrimination is presumed or "built in to the 'regarded as' definition." <u>See</u> <u>Lewis</u>, 877 F.3d at 1014.   In other words, "[t]he evidence tending to prove the 'regarded as' definition of disabled therefore often is duplicative of the evidence relevant to the third *prima facie* element." <u>Id.</u> (citing 29 C.F.R. § Pt. 1630, App.). Accordingly, the Court finds that Plaintiff Smart has satisfied his burden of demonstrating the *prima facie* elements of a perceived disability discrimination claim.

81

The Court now turns to the remaining <u>McDonnell-Douglas</u> inquiries, whether Defendant has articulated a legitimate nondiscriminatory reason for the challenged conduct and whether Plaintiff has adduced evidence of pretext.[40]

**b.      Legitimate Nondiscriminatory Reason**

Defendant represents that "[t]he sole reason Plaintiff was refrained from duty in March of 2015 was due to the fact that Caduceus disqualified him from returning to work after he failed his DOT recertification physical." [Doc. 66-2 at 22]. Defendant also states that "[t]he sole reason Plaintiff was not allowed to return to work in June 2015 was because he did not present an acceptable medical certification card as it did not derive from Caduceus, where results from Plaintiff's CDL recertification physical were pending." [<u>Id.</u>].

Plaintiff suggests that because the CDL physical exam is a qualification standard, that under the reasoning in <u>Toole</u>, it is not legitimate or nondiscriminatory because it tends to screen out individuals with a disability unless "shown to be job-related and consistent with business necessity, and such performance cannot be

_____

[40] Defendant DeKalb stopped its legal analysis short and with the exception of a cursory response to Plaintiff's legal arguments that summary judgment should be granted in his favor on both claims, only addressed whether or not Plaintiff Smart was able to prove up the *prima facie* case.

82

accomplished by reasonable accommodation . . . ." See Toole, 17 F. Supp. 3d at 1178–79 (quoting § 12112(b)(6), which prohibits discrimination based upon qualification standards that screen out or tend to screen out individuals with a disability, and § 12113(a), providing for employer's affirmative defense available for otherwise problematic standard).

Plaintiff further contends that Defendant is unable to show a legitimate, nondiscriminatory reason based upon the notion that Defendant's requirement that its commercial drivers maintain a Class A CDL and periodically submit to the CDL physical impedes the operation of Georgia state law that allows commercial drivers employed by the city or county to self-certify as Class D CDL drivers and exempts them from the federal CDL physical exam.[41]  [Doc. 52-1 at 27–28 (citing Willis v. Atlanta, 285 Ga. 775, 776 & n.2, 684 S.E.2d 271, 273 & n.2 (Ga. 2009))].   As acknowledged by Plaintiff, Defendant DeKalb's burden on this issue is only a burden of production and not a burden of persuasion.  See Id. at 1178.

The Court finds that Defendant has met its burden of articulating a legitimate nondiscriminatory reason for its adverse action.

---

[41] Plaintiff Smart eventually self-certified for CDL privileges.

83

c.      Pretext

In attempting to show pretext, "[a] plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer.  Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." Chapman v. AI Transport, 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc).  "[T]o avoid summary judgment, [a plaintiff] must introduce *significantly probative evidence* showing that the asserted reason is merely pretext for discrimination." Clark v. Coats & Clark, Inc., 990 F.2d 1217, 1228 (11th Cir. 1993) (emphasis provided); see also Cleveland v. Home Shopping Network, Inc., 369 F.3d 1189, 1193 (11th Cir. 2004) (explaining that plaintiff was "allowed to show defendant's reason was 'unworthy of credence' and a pretext for discrimination" and reversing summary judgment for defendant employer finding that ADA plaintiff's evidence created jury question as to defendant's stated reason for adverse action).  The plaintiff is charged with presenting evidence that "cast[s] sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered 'legitimate reasons were not what actually motivated its conduct[.]'" Combs v.

84

Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997) (quoting Cooper-Houston v. Southern Ry. Co., 37 F.3d 603, 605 (11th Cir. 1994) (citation omitted)).  The plaintiff may attempt to show that the employer's articulated reasons are not believable by pointing to "'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions'" in the proffered explanation. Id. (citation omitted); and see Jackson v. State of Alabama  State Tenure Comm'n, 405 F. 3d 1276, 1289 (11th Cir. 2005) (citation omitted).  The Court finds that Plaintiff has met his burden.

Plaintiff, who contends that the Court need not even reach the question of pretext, provides the Court with a laundry list of proposed facts that he contends show that Defendant DeKalb's rationale for its actions regarding Plaintiff Smart is actually a pretext for a discriminatory motive.  [Doc. 52 at 28–30].  Plaintiff argues that the following facts constitute evidence of pretext: (a) Defendant accommodates DUI offenders but not the disabled; (b) Defendant allows injured or sick employees to work light duty and does not provide alternatives to employees who fail a CDL physical because of disability; (c) Defendant allows some employees who drive commercial vehicles to work without a CDL physical card but strictly enforced the same against Plaintiff; (d) Defendant never actually accommodated disabled CDL holders during Nurse Bailey's tenure; (e) Defendant ignored its 1990 Policy; and (f) Defendant's head

of Roads and Drainage, Peggy Allen, suspected there was a problem after receiving a demand letter from Plaintiff Smart's prior counsel. [Id.].

In interest of judicial economy, the Court finds that for the reasons already discussed herein, the evidence weighs in favor of a jury trial. The Court also notes that the synthesis of the record evidence that a reasonable jury might rely upon to find that Plaintiff's requests for accommodation were reasonable may also be considered evidence of pretext.

Finally, Smart had been employed by DeKalb since 1995 – nearly twenty (20) years. By all accounts, Smart's job performance was positive - above satisfactory. [Smart Dep. 151]. A performance appraisal of Plaintiff from June 2013 was summarized as follows:

> Mr. Smart is an exceptional supervisor with unlimited upside. He is more than capable of handling any task and does a good job of delegating responsibilities.

[Smart Dep. 154–55, Pl. Exhibit 4]. Regardless of Smart's apparent non-compliance with Caduceus, Plaintiff Smart was never advised or never counseled *by Defendant DeKalb*, his longtime employer, about obtaining the clearance or vision exemption, assuming it was actually needed.

86

Accordingly, the undersigned **RESPECTFULLY RECOMMENDS** that both of the parties' motions be **DENIED** as to Plaintiff's disparate treatment theory of disability discrimination.

## V.    Conclusion

Based on the foregoing reasons and cited authority, and given that genuine issues of material fact exist that preclude summary judgment disposition, the undersigned **RESPECTFULLY RECOMMENDS** that Defendant's motion [Doc. 66] be **DENIED** and that Plaintiff's motion [Doc. 52] be **DENIED**.

It is **ORDERED** that Defendant's motion [Doc. 68] to strike is **DENIED**.

All pretrial matters have been concluded with the issuance of this Report and Recommendation in accordance with 28 U.S.C. § 636(b)(1), this Court's Local Rule 72.1, and Standing Order 14-01 (N.D. Ga. August 15, 2014).  The Clerk, therefore, is **DIRECTED** to terminate the reference to the Magistrate Judge.

**SO ORDERED THIS** 5th day of January, 2018.

JANET F. KING
UNITED STATES MAGISTRATE JUDGE