# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

JAMES ANTHONY SMART, JR.,

      **Plaintiff,**

      **v.**                                                    1:16-cv-826-WSD

DEKALB COUNTY, GEORGIA,

      **Defendant.**

## <u>OPINION AND ORDER</u>

This matter is before the Court on Magistrate Judge Janet F. King's Final

Report and Recommendation [78] ("R&R"). The Final R&R recommends the

Court deny Plaintiff James Anthony Smart, Jr.'s ("Plaintiff") Motion for Summary

Judgment [52] and Defendant DeKalb County, Georgia's ("Defendant," or

"DeKalb County") Motion for Summary Judgment [66]. Also before the Court are

Plaintiff's Objections to Order and Report and Recommendation on a Motion for

Summary Judgment [80] ("Plaintiff's Objections") and Defendant's Objections to

the Magistrate Judge's Report and Recommendation [81] ("Defendant's

Objections").

# I.    BACKGROUND

### A.    Facts[1]

On June 12, 1995, Plaintiff began working for DeKalb County Roads and Drainage as a crew worker.  (Deposition of James Anthony Smart, Jr. [53] ("Smart Dep") at 131:11-15).  Plaintiff was promoted over the years to senior crew worker, equipment operator, senior equipment operator, crew supervisor, and, finally, construction supervisor.  (Smart Dep. at 131-37).  Plaintiff held the position of construction supervisor from June 2006 until his resignation in November of 2015.  ([71.1] at 7-8).

While employed as a construction supervisor, Plaintiff was required to maintain a Class A Commercial Driver's License ("CDL") to perform at least some of his duties.  (Smart Dep. at 24:5-23; [71.1] at 13).  During the relevant period, Plaintiff possessed a Class A CDL[2] with an expiration date of March 1, 2016.  (Smart Dep. at 42:10-25).  Plaintiff was also required to submit to

---

[1]    The facts are taken from the Final R&R and the record.  The parties have not objected to any specific facts in the Final R&R, and the Court finds no plain error in them.  The Court thus adopts the facts set out in the Final R&R.  See Garvey v. Vaughn, 993 F.2d 776, 779 n.9 (11th Cir. 1993).

[2]    The Class A CDL is the highest CLD, which means the holder of this type of CDL can operate all CDL vehicles.  (Smart Dep. at 189:16-21).

a physical examination approximately once every one to two years for purposes of assessing whether Plaintiff could maintain his CDL. (Smart Dep. at 32:12-17).

On March 12, 2015, while at work, Plaintiff was "informed [] that he had to go down to take a CDL physical." (Smart Dep. at 52:11-16). Later that day, Plaintiff went to the medical offices of Caduceus USA, Defendant's third-party occupational health medical provider, located in Tucker, Georgia. (Id. at 52; Deposition of Karyn Keaton-Bailey [54] ("Bailey Dep") at 14:16-22). During his visit, Plaintiff submitted to a number of tests, including ones for vision and blood pressure. (Smart Dep. at 56). Plaintiff also informed the examining nurse that he was taking eye drops for glaucoma and medication for high blood pressure. (Id. at 56-58). Plaintiff was ultimately told that "he couldn't pass" the examination unless he received a note from his doctor stating that he was able to drive. (Id.).

As a result, Caduceus USA issued a report stating, with regard to Plaintiff's "work status" that Plaintiff was "disqualified/off work" due to glaucoma/hypertension. ([71.1] at 21). Upon receipt of the report, DeKalb County's Nurse Manager, Karyn Keaton-Bailey, one of the people responsible for ensuring that CDL drivers receive their physicals in a timely manner, sent a work status form to Roads and Drainage refraining Plaintiff from duty. (Bailey Dep. at 11-12, 17-20, 22-23, 31 62; Smart Dep. 22-23). The next day, on March 13, 2015,

Plaintiff was sent home from work and placed on "refrain from duty" status.

(Smart Dep. at 74:11-18).

On March 16, 2015, Georgia Department of Driver Services ("DDS")

mailed Plaintiff a letter stating:

> Changes to state and federal law require the Department of Driver
> Services (DDS) to collect copies of the medical certificates held by all
> commercial drivers beginning January 1, 2012.  Additionally, each
> commercial driver must certify or re-certify the type of driving in
> which he/she engages.  Any commercial driver who fails to satisfy
> these requirements within the time allotted in that regulation will no
> longer be qualified to operate a commercial vehicle until they re-
> certify or submit a new medical qualification card to DDS.
>
> Your driving record indicates that either your medical certificate is
> expired or you have otherwise failed to comply with medical
> certificate requirements applicable to commercial drivers.  As a result,
> the DDS will change your CDLIS medical certification status to
> "NOT CERTIFIED" and you will no longer be qualified to operate a
> commercial vehicle effective 03/15/2015.  Please note that your non-
> commercial driving privilege is not impacted by this.  However, you
> cannot lawfully operate a commercial vehicle on or after this date.

(Smart Dep. at 49:3-25, 50:1-2).  Shortly after receiving the letter, Plaintiff visited

his personal ophthalmologist's office for follow-up tests and to request a letter

demonstrating that it was acceptable for him to drive.  (Smart Dep. at 64-67).  On

March 18, 2015, Plaintiff's ophthalmologist authored a letter for Plaintiff, stating:

"James A Smart has been treated in our office for Advanced Open Angle

glaucoma. He has 20/20 vision in both eyes, but a limited field of vision."
(Declaration Dr. Polly Henderson, M.D. [52.7] ("Henderson Decl.") ¶ 6).

Plaintiff provided Caduceus USA with a new blood pressure reading and the letter from his ophthalmologist concerning his glaucoma. (Smart Dep. at 70-71). Plaintiff was informed that this was insufficient, however, and that Caduceus required Plaintiff to provide an exemption form from the Department of Transportation ("DOT"), which could be obtained from the Georgia DDS. ([66.4] at 16-17). On April 6, 2015, after an examination of Plaintiff on March 23, 2015, Plaintiff's ophthalmologist completed the vision exemption form and shortly thereafter remitted the form directly to Caduceus. ([52.5] at 217; Smart Dep. at 81-82).

Plaintiff asked if Caduceus would release him to return to work, but, according to Plaintiff, Caduceus advised him that "it was up to the county" to make that determination. (Smart Dep. at 84). As a result, Plaintiff approached Leo Owens, the Roads and Drainage administrative service manager, about his desire to return to work. (Smart Dep. at 84). Plaintiff testified in his deposition:

> I went up to the job. I saw that [Leo] was in his office. I walked in his office and I spoke with him and I asked him, I said, Leo, I need to come back to work. Even if it means not driving a county vehicle. . . . I mean if I need to grab a shovel and be a crew worker, I can do that and he told me he couldn't let me return to work until I passed a physical because my job required a CDL physical.

(Smart Dep. at 198:14-23).  Plaintiff did not return to work after this date.

On or about June 23, 2015, Plaintiff sought out a private physician to perform an independent CDL physical examination.  (Smart Dep. at 87-88). Plaintiff obtained a Medical Examiner's Certificate from Dr. Vikash Modi indicating that Plaintiff passed the CDL physical requirements.  (Id. at 148-49; Deposition of Michelle Harkles [59] ("Harkles Dep.") at 12-14; Deposition of Leonardo Owens [60] ("Owens Dep.") at 19-21).  On June 26, 2015, Plaintiff went to work and presented the Medical Examiner's Certificate to Owens's administrative assistant who informed Plaintiff that it was insufficient because it was not issued by Caduceus USA.  (Smart Dep. at 149; Harkles Dep. at 12-14; Owens Dep. at 19-20).

In 1990, DeKalb County issued a written policy regarding physical examination requirements for CDLs.  (Deposition of Katherine Furlong [63] ("Furlong Dep.") at 12).  The 1990 policy provided:

> All DeKalb County drivers who are required by the State of Georgia to have a valid [CDL] while operating County vehicles shall be required, as a condition of employment, to pass the same State of Georgia physical examination requirements for driver's license renewal as drivers of vehicles operated by private entities in the State of Georgia.  This may be accomplished by passing a physical examination provided by DeKalb County or by the employee providing documentation that he or she passed the state required

physical examination by any physician acceptable to the State of Georgia.

(Id.).

On November 18, 2015, Plaintiff tendered his resignation letter to Defendant. (Smart Dep. at 26-27; CITE). According to Smart, he resigned out of necessity because he needed to access funds from his DeKalb County pension fund. On February 29, 2016, Plaintiff renewed his Class A CDL. (Smart Dep. at 98).

B.    Procedural History

On March 14, 2016, Plaintiff filed his initial Complaint [1], and on July 1, 2016, Plaintiff filed his First Amended Complaint [13]. Plaintiff alleges that Defendant intentionally discriminated against Plaintiff in violation of the Americans with Disabilities Act ("ADA") by (i) sending him home after a physical exam showing he had high blood pressure and glaucoma, (ii) failing to provide a reasonable accommodation later requested by Plaintiff, and (iii) failing to allow Plaintiff to return to work when he presented a renewed CDL with a valid medical certification. ([13] ¶¶ 26-27). Plaintiff also alleges, for the same reasons articulated in his ADA claim, that Defendant intentionally discriminated against Plaintiff in violation of the Rehabilitation Act of 1973. (Id. ¶¶ 28-29).

On May 5, 2017, Plaintiff and Defendant filed their respective Motions for Summary Judgment. Plaintiff argues in his Motion for Summary Judgment that (1) he is actually disabled and was "regarded as" disabled by Defendant; (2) he is a qualified employee, with or without reasonable accommodation, and he can perform all of his essential job functions; and (3) he was subject to unlawful discrimination because of his disability. ([52.1] at 1-24). Defendant argues in its Motion for Summary Judgment that (1) Plaintiff fails to meet his burden of establishing a *prima facie* case of discrimination under the ADA and Rehabilitation Act; (2) Defendant had legitimate, non-discriminatory reasons with regard to actions it took pertaining to Plaintiff's employment; and (3) Plaintiff cannot meet his ultimate burden of establishing that he was entitled to and denied a reasonable accommodation that Defendant intentionally discriminated against him on the basis of his disability. ([66.2] at 2-3).

On January 5, 2018, the Magistrate Judge issued her Final R&R recommending denying Plaintiff's and Defendant's Motions for Summary Judgment. The Magistrate Judge found, with respect to the first element required to show a *prima facie* case of disability discrimination under the ADA, that, although Plaintiff failed to present facts sufficient to show he has an actual disability because he failed to demonstrate that either his glaucoma or hypertension

"substantially limit[]" a major bodily function or major life activity, Plaintiff presented sufficient evidence from which a jury could reasonably infer that Plaintiff was "regarded as" disabled by Defendant. ([78] at 44, 46, 49, 55). The Magistrate Judge found, with respect to the second element, that Plaintiff produced sufficient evidence creating a genuine issue of material fact regarding whether a Class A CDL was an essential function of Plaintiff's job, and, therefore, whether Plaintiff was a "qualified individual" under the ADA. (Id. at 67-68). Finally, the Magistrate Judge found, as to the third element, that a genuine issue of material fact exists as to whether Defendant was discriminated against "because of" his disability. (Id. at 78) The Magistrate Judge explained that (1) Plaintiff presents evidence giving rise to a triable issue concerning whether Plaintiff identified and proposed to Defendant a reasonable accommodation and (2) a genuine issue of material fact exists as to whether Plaintiff was subjected to disparate treatment. (Id. at 78, 79).

On January 22, 2018, Plaintiff filed his Objections. Plaintiff objects to the Magistrate Judge's finding that Plaintiff has failed to offer sufficient evidence that he was "actually" disabled—that is, that he suffered a physical impairment that substantially limited his major life activity of seeing, neurological function, and working. ([80] at 1). Plaintiff contends that the Henderson Affidavit [52.6],

Plaintiff's medical records [52.4], Dr. Roaf's March 20, 2015, and April 1, 2015, notes, and Plaintiff's Declaration [74.1] create a question of material fact as to whether Plaintiff suffered a substantial limitation to his major life activity of seeing under the ADA and that Defendant had a record of this. ([80] at 15). Plaintiff argues that the Magistrate Judge "recites ample medical record evidence supporting a finding of a substantial impairment to vision." (Id.). Plaintiff next objects to the Magistrate Judge's finding that "having and maintaining a Class A CDL" is a job function and not a qualification standard. (Id. at 22). Plaintiff further objects to the Final R&R's "failure to find that Defendant imposed a discriminatory qualification standard." (Id. at 23). Plaintiff contends that the Magistrate Judge should have concluded that Plaintiff was fully qualified on March 13, 2015. (Id. at 23-24). Finally, Plaintiff objects to the finding that Defendant offered a legitimate, non-discriminatory reason for its actions. (Id. at 25).

On January 23, 2018, Defendant submitted its Objections to the Final R&R.[3] Defendant first argues that the Magistrate Judge's finding that a reasonable jury

---

[3]  Defendant seeks this Court to overturn the Magistrate Judge's evidentiary ruling denying Defendant's Motion to Strike portions of Dr. Henderson's Affidavit because Plaintiff did not provide the required disclosures under either Rule 26(a)(2)(B) or Rule 26(a)(2)(C). The Court notes that Defendant incorrectly

could find that Plaintiff was "regarded as" disabled should be rejected because

there is no evidence, and none is relied upon in the Final R&R, that any specific

individuals employed by Defendant regarded or perceived Plaintiff as disabled.

([81] at 13-16). Defendant next contends that the Magistrate Judge's

recommendation that a genuine issue of material fact exists as to whether Plaintiff

can demonstrate he was a qualified individual should be rejected because there is

no genuine issue of material fact regarding whether having a Class A CDL was an

essential function of Plaintiff's job. (Id. at 16-20). Defendant further objects to the

Magistrate Judge's finding that a genuine issue of material fact exists as to whether

Plaintiff can demonstrate that Defendant denied his request to accommodate. (Id.

at 20-23). Finally, Defendant argues that the Magistrate Judge's recommendation

regarding Plaintiff's claim that Defendant violated the ADA by treating him as

---

identifies the Magistrate Judge's ruling on a non-dispositive, evidentiary issue as a
recommendation. Under 28 U.S.C. § 636(b)(1)(A) and Rule 72 of the Federal
Rules of Civil Procedure, the Court reviews non-dispositive findings by a
magistrate judge for clear error. The Final R&R's ruling on the Defendant's
Motion to Strike was non-dispositive. The Court therefore reviews this ruling for
clear error.
    The Court finds no clear error in the Magistrate Judge's ruling denying
Defendant's Motion to Strike. Defendant simply reiterates the same argument
regarding disclosures articulated in its Motion to Strike, which the Magistrate
Judge fully considered in her Final R&R.

disabled in comparison to others was based on an erroneous application of the law. (Id. at 23-27).

## II.  LEGAL STANDARDS

### A.  Review of a Magistrate Judge's R&R

After conducting a careful and complete review of the findings and recommendations, a district judge may accept, reject, or modify a magistrate judge's report and recommendation.  28 U.S.C. § 636(b)(1); Williams v. Wainwright, 681 F.2d 732, 732 (11th Cir. 1982) (per curiam).  A district judge "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made."  28 U.S.C. § 636(b)(1).  Where no party has objected to the report and recommendation, the Court conducts only a plain error review of the record.  United States v. Slay, 714 F.2d 1093, 1095 (11th Cir. 1983) (per curiam).

Because the parties have filed Objections, the Court conducts its review of the Magistrate Judge's Final R&R de novo.  See Slay, 714 F.2d at 1095.

### B.  Summary Judgment Standard

Summary judgment is appropriate where the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law.  <u>See</u> Fed. R. Civ. P. 56.  The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact. <u>Herzog v. Castle Rock Entm't</u>, 193 F.3d 1241, 1246 (11th Cir. 1999).  Once the moving party has met this burden, the nonmoving party must demonstrate that summary judgment is inappropriate by designating specific facts showing a genuine issue for trial.  <u>Graham v. State Farm Mut. Ins. Co.</u>, 193 F.3d 1274, 1282 (11th Cir. 1999).  The nonmoving party "need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings."  <u>Id.</u>

"At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts."  <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007).  Where the record tells two different stories, one blatantly contradicted by the evidence, the Court is not required to adopt that version of the facts when ruling on summary judgment.  <u>Id.</u> "[C]redibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury . . . ."  <u>Graham</u>, 193 F.3d at 1282.  "If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial."  <u>Herzog</u>, 193 F.3d at 1246.  The party opposing summary judgment "'must do more than simply show that there is some

metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'"  Scott, 550 U.S. at 380 (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)).  A party is entitled to summary judgment if "the facts and inferences point overwhelmingly in favor of the moving party, such that reasonable people could not arrive at a contrary verdict."  Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002) (quotations omitted).

"Finally, the filing of cross-motions for summary judgment does not give rise to any presumption that no genuine issue of material fact exist."  3D Medical Imaging, Sys., LLC v. Visage Imaging, Inc., 228 F. Supp. 3d 1331, 1336 (N.D. Ga. January 11, 2017).  "Rather, '[c]ross-motions must be considered separately, as each movant bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law."  Id. (quoting Shaw Constructors v. ICF Kaiser Eng'rs, Inc., 395 F.3d 538-39 (5th Cir. 2004). The Rule 56 standard is applied to cross-motions for summary judgment just as if only one party had moved for summary judgment and "simply requires a determination of whether either of the parties deserves judgment as a matter of law on the facts

that are not disputed." <u>Yager v. Lockheed Martin Corp.</u>, 2016 WL 319858, at *3

(N.D. Ga. January 26, 2016).

      C.      <u>The Rehabilitation Act, 29 U.S.C. § 794(a)</u>

"The Rehabilitation Act prohibits federal agencies [and recipients of federal

money] from discriminating in employment against individuals with disabilities."

<u>Ellis v. England</u>, 432 F.3d 1321, 1326 (11th Cir. 2005) (citing <u>Mullins v. Crowell</u>,

228 F.3d 1305, 1313 (11th Cir. 2000)); <u>see also</u> 29 U.S.C. § 794(a);

42 U.S.C. § 1981a(a)(2). "The standard for determining liability under the

Rehabilitation Act is the same as that under the Americans with Disabilities Act,

42 U.S.C. § 12101, <u>et. seq.</u> ("ADA"); thus, cases involving the ADA are precedent

for those involving the Rehabilitation Act." <u>Ellis</u>, 432 F.3d at 1326 (citing <u>Cash v.

Smith</u>, 231 F.3d 1301, 1305 (11th Cir. 2000); and 29 U.S.C. § 794(d)).

Accordingly, Plaintiff's Rehabilitation Act is treated the same as, and

effectively merged with, his ADA claim.

      D.      <u>The Americans with Disabilities Act ("ADA") of 1990, As Amended
by the ADA Amendments Act ("ADAAA") of 2008</u>

In general terms, the ADA prohibits covered employers from discriminating

"against a qualified individual on the basis of disability in regard to job application

procedures, the hiring, advancement, or discharge of employees, employee

compensation, job training, and other terms, conditions, and privileges of

employment." See 42 U.S.C. § 12112(a); see also Wascura v. City of South Miami, 257 F.3d 1238, 1242 (11th Cir. 2001).[4]

To establish a *prima facie* case of disability-based discrimination under the ADA, a plaintiff must demonstrate that: (1) he has a disability as defined in the ADA; (2) he is a "qualified individual," meaning that, with or without reasonable accommodations, he can perform the essential functions of the job he holds; and (3) he was discriminated against because of his disability. See Mazzeo v. Color Resolutions Int'l, LLC, 746 F.3d 1264, 1268 (11th Cir. 2014) (citing Holly v. Clairson Industries, LLC, 492 F.3d 1247, 1256 (11th Cir. 2007); Greenberg v. BellSouth Telecommunications, Inc., 498 F.3d 1258, 1263 (11th Cir. 2007). The ADA's definition of "discriminate" includes a failure to make reasonable accommodations to the limitations of an individual with a disability. See 42 U.S.C. § 12112(b)(5)(A).

## III. DISCUSSION

The Court addresses below each of the three elements required to establish a *prima facie* disability-based discrimination claim under the ADA.

---

[4]      The ADA was amended by the ADAAA in 2008, and the amendments became effective on January 1, 2009. See Dickey v. Dollar General Corp., 351 F. App'x. 389, 391 & n.3 (11th Cir. 2009).

A.    Disability

To state a disability claim under the ADA, Plaintiff must first show that he suffers from a "disability" as defined under the ADA.  The ADA defines "disability" as: "(A) a physical or mental impairment that substantially limits one or more major life activities . . .; (B) a record of such an impairment; or (C) being regarded as having such an impairment . . . ." 42 U.S.C. § 12102(1)(A)-(C) (2009).

As contemplated by Congress and the 2008 amendment to the ADA, determining "'whether an individual's impairment is a disability under the ADA should not demand extensive analysis.'"  Mazzeo, 746 F.3d at 1268 (quoting 42 U.S.C. § 12102(1) & n.2); see also 29 C.F.R. § 1630.2(j)(1)(iii) (explaining rule of construction that "[t]he primary object" or focus of ADA cases "should be whether covered entities have complied with their obligations and whether discrimination has occurred[,]" as opposed to "whether an impairment 'substantially limits' a major life activity").  The ADA's rules of construction regarding the definition of disability provide that "[t]he definition of disability shall be construed in favor of broad coverage of individuals. . . ." 42 U.S.C. § 12102(4)(A).

1.    Actually Disabled

Plaintiff first asserts that, because of his glaucoma and hypertension, he is "substantially limit[ed]"—in other words, actually disabled—in the following major life activities: (1) seeing; (2) hypertension/circulatory function; and (3) working. ([71] at 4-5). 42 U.S.C. § 12102(1)(A). "[M]ajor life activities include, but are not limited to, . . . seeing . . . and working." 42 U.S.C. § 12102(2)(A). The relevant regulations provide that major life activities also include "[t]he operation of a major bodily function, including but not limited to . . . circulatory . . . functions." 42 U.S.C. § 12102(2)(B). The operation of a major bodily function includes the operation of an individual organ within a body system." 29 C.F.R. § 1630.2(i)(1)(ii).

"The term 'substantially limits' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA." 29 C.F.R. § 1630.2(j)(1)(i). Courts making a disability evaluation must consider whether an impairment "substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population." 29 C.F.R. § 1630.2(j)(1)(ii). An impairment may be substantially limiting even if it does not "prevent, or significantly or severely restrict, the individual from performing a major life activity . . . ." Id. "Nonetheless, not every impairment will

constitute a disability within the meaning of [the ADAAA]." Id.  In determining

whether an impairment substantially limits a major life activity, "the ameliorative

effects of mitigating measures . . . [with the exception of t]he ameliorative effects

of the mitigating measures of ordinary eyeglasses or contact lenses" are not to be

taken into account. 42 U.S.C. §§ 12102(4)(E)(i)(I) and (ii).

"EEOC regulations inform the courts that the following factors are relevant

in determining whether an individual has a disability: '(i) The nature and severity

of the impairment; (ii) The duration or expected duration of the impairment; and

(iii) The permanent or long term impact, or the expected permanent or long term

impact of or resulting from the impairment.'" Shepard v. United Parcel Serv., Inc.,

470 F. App'x. 726, 729 (11th Cir. 2012) (quoting Garrett v. University of Alabama

at Birmingham Bd. of Trs., 507 F.3d 1306, 1311 (11th Cir. 2007)).

Plaintiff produced medical records showing his history of glaucoma for the

past ten years.  ([52.5]; [52.7]).  On February 5, 2015, Plaintiff attended a follow-

up appointment for his glaucoma with his treating ophthalmologist, Dr. Henderson.

([52.5] at 158-160).  At that time, Plaintiff was prescribed and taking various

medications to treat his glaucoma.  ([52.5] at 159).  During his visit, Plaintiff

reported compliance with the prescribed medications and denied any side effects.

Dr. Henderson noted:  "No visual acuity changes, eye pain, flashes, new flowers,

and/or photophobia. No previous eye surgeries, lasers, injections." (Id.). Dr. Henderson also noted: "History of Primary Open Angle Glaucoma by report – intraocular pressure better both eyes today – but borderline; patient with significant cupping/pallor to nerves[]; + family history of glaucoma (mother); no chronic steroid use; no previous history of eye trauma – NO drops today per patient." ([52.5] at 162). Dr. Henderson recommended Plaintiff keep using the eye drops and return in one month for an intra ocular pressure test and "possible SLT right eye[.]" ([52.5] at 162). Soon after, Dr. Henderson recommended surgery to remedy Plaintiff's glaucoma.

On March 2, 2015, and again on April 27, 2015, Dr. Henderson performed laser eye surgery on Plaintiff for his glaucoma. ([52.5] at 166-74, 225-29). Plaintiff's diagnosis on his right eye was "BILAT PRIMARY OPEN ANGLE GLAUCOMA, SEVERE STAGE." (Id. at 163, 166-170, 225-29). Plaintiff's diagnosis on his left eye was "BILAT PRIMARY OPEN ANGLE GLAUCOMA, MODERATE STAGE." (Id.). As recorded on Plaintiff's DOT/DDS Vision Exemption Form, Dr. Henderson's March 23, 2015, examination established that Plaintiff's left eye range of vision at 40 degrees and right eye range of vision at 60 degrees—below the requisite 70 degrees for the CDL physical exam. (Id.). Aside from observing Plaintiff's "limited peripheral vision[,]" which was deemed stable,

Dr. Henderson did not identify any related restrictions relevant to Plaintiff's ability to participate in activities such as driving.  (Id.).  Plaintiff's visual acuity examination reflected 20/20 vision in both eyes with the use of glasses.  (Id.).  On March 12, 2015, at the time of his visit to Caduceus USA, Plaintiff wore corrective lens eyeglasses and had been wearing them for about twenty years.  (Smart Dep. at 102-03).  When asked about actual limitations related to his vision, Plaintiff testified that he had no issues and was not limited in his driving, reading, watching television, doing chores, engaging in activities with his adult twins (age 21) or his seven year old daughter, or taking care of himself on a day-to-day basis when wearing his glasses.  (Smart Dep. at 103-08).  Plaintiff states that his glaucoma is no longer severe thanks to his medication and surgeries.  (Declaration of James Anthony Smart, Jr. [71.2] ("Smart Decl.") ¶¶ 3, 7].  Plaintiff further asserts that he "hardly ever [has] any problems if [he] can take [his] medication"  (Id. ¶ 3).

Plaintiff first argues in his Objections that the Magistrate Judge erroneously found that he did not suffer from an actual disability because his impairment did not substantially limit his major life activities.  ([80] at 1-22).  Plaintiff contends that the Magistrate Judge failed to discuss certain evidence in the Final R&R, including, for example, that Plaintiff failed his CDL physical examination

previously because of color blindness.[5]  ([80] at 2-3).  The Court notes that the

record in this case is voluminous.  The Magistrate Judge acknowledges in fact in

the Final R&R that although she "does not cite every single piece of evidence

relied upon by the parties[,]" "[w]hat the Court finds to be the most probative

evidence is discussed in greater detail."  ([78] at 13 n.7).  In conducting a thorough

review of the evidence, the Court reaches the same conclusion as the Magistrate

Judge—that is, while Plaintiff suffered impairment due to his glaucoma, his

impairment did not substantially limit a major life activity.

Plaintiff's testimony demonstrates that his limitations were less than severe

and of a relatively short duration.  Plaintiff testified that he was able to participate

in everyday activities, and any issues were eased when wearing glasses.  For

example, Plaintiff testified that he had no issue with reading, driving, watching

television, or generally taking care of himself.  (Smart Dep. at 103-08).  Plaintiff

also made it clear that he was ready and willing to return to work as soon as

possible.  (Id.).  Around April 2015, Plaintiff went so far as to say to Leo Owens, the

---

[5]     It is unclear to the Court how Plaintiff's failing a CDL physical examination
because of colorblindness more than ten years prior to the CDL physical
examination that is the subject of this action is related to his alleged disability of
glaucoma, or how failing it substantially limited major life activities during the
relevant time period alleged in the Complaint.

Roads and Drainage administrative service manager: "I walked in his office and I spoke with him and I asked him, I said, Leo, I need to come back to work. . . . I mean if I need to grab a shovel and be a crew worker, I can do that." (Smart Dep. at 198:14-23). Again, in June 2015, Plaintiff clocked into work and attempted to use his independently obtained medical certificate to continue working. (Smart Dep. at 100-01). The Court thus finds that, based on the record before it, Plaintiff is unable to show that his glaucoma substantially limited a major bodily function or major life activity. See 42. U.S.C. 12102(1).

Plaintiff also argues that his hypertension constitutes an actual disability. In 2014, Plaintiff began taking medication to ameliorate his high blood pressure. (Smart Dep. at 107-08). Plaintiff's medical records demonstrate that his blood pressure readings around the relevant time period fluctuated greatly.[6] (See, e.g., [52.5] at 116, 160; Smart Dep. at 66-68). On a couple of occasions, Plaintiff's systolic and diastolic readings were recorded slightly above the standard threshold. (Id.). Plaintiff further testified that, since he had been taking medication, he was not limited or restricted by his hypertension in his driving, reading, taking care of himself on a day-to-day basis, taking care of his daughter on a day-to-day basis,

---

[6]     Nurse Bailey testified that a blood pressure reading of 140/90 is the standard for a diagnosis of elevated blood pressure or hypertension. (Bailey Dep. at 24-25).

doing chores or activities around the home, and likewise not affected in his sleeping. (Smart Dep. at 109). Although it is apparent Plaintiff suffers impairment due to his hypertension, it is also evident that Plaintiff is not "substantially limited" because of it. There is no evidence that Plaintiff is unable to accomplish a major life activity due to his hypertension. As with the Court's reasoning regarding Plaintiff's glaucoma, Plaintiff has demonstrated that he continues to accomplish day-to-day tasks with no issue and was more than willing to return to work despite his hypertension. Plaintiff is therefore also unable to show that his hypertension "substantially limits" a major bodily function or major life activity. See 42 U.S.C. § 12102(1).[7]

---

[7] Because Plaintiff cannot show that he is "actually disabled," he also cannot show disability by demonstrating there is "a record of such an impairment." See Hetherington v. Wal-Mart, Inc., 511 F. App'x 909, 913 (11th Cir. 2013) (citing Hilburn v. Murata Electronics North America, Inc., 181 F.3d 1220, 1229 (11th Cir. 1999) (finding that the record-of-impairment prong can be satisfied only if the plaintiff "actually suffered a physical impairment that substantially limited one or more of h[is] major life activities."). Plaintiff contends in his Objections that the rulings in these cases do not apply because they are pre-ADAAA. ([80] at 21-22). Plaintiff further argues that the Eleventh Circuit in Mazzeo, 746 F.3d at 1268 "acknowledged that the ADAAA made substantial changes to the definition of disability and made it much easier for plaintiffs to prove disability." (Id.). Plaintiff does not, however, advance any new authority or further argument articulating why this pre-ADAAA standard is no longer applicable. The Court itself is unable to locate any recent authority demonstrating that the rulings in Hetherington or Hilburn are no longer applicable because of the 2008 amendments. Plaintiff's Objections on this issue are overruled.

### 2. "Regarded As" Disabled

Plaintiff next alleges a "disability" because Defendant "regarded [him] as having such an impairment." "An individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity."[8] 42 U.S.C. § 12102(3)(A). "Prohibited actions include but are not limited to refusal to hire, demotion, placement on involuntary leave, termination, exclusion for failure to meet a qualification standard, harassment, or denial of any other term, condition, or privilege of employment. . . ." 29 C.F.R. § 1630.2(1)(1). "The relevant inquiry in such cases is not the plaintiff's actual condition, but how the Defendant 'perceived [his] condition, including the reactions and perceptions of the persons interacting with or working with him.'" E.E.O.C. v. American Tool & Mold, Inc., 21 F. Supp. 3d 1268, 1275 (M.D. Fla. 2014). "Moreover, the 'regarded as' analysis is separate

---

[8] An individual will not, however, meet the requirement of being "regarded as" disabled if his impairment is "transitory and minor." 42 U.S.C. § 12102(3)(B). "A transitory impairment is an impairment with an actual or expected duration of 6 months or less." Id. According to the medical records and testimony, Plaintiff's history of glaucoma dated back ten (10) years, and neither party addresses or argues the transitory aspect of Plaintiff's impairment during the relevant time period.

from whether the employer can eventually establish a defense to the action[.]"  Id. at 1275-76; accord Lewis v. City of Union City, 877 F.3d 1000, 1012 (11th Cir. 2017) (finding that for purposes of the "regarded as" disabled prong, an employer's defense to its adverse employment action, such as a safety concern, is a separate inquiry).

The record establishes that Defendant took a prohibited action against Plaintiff when it placed him on refrain from duty status in March 2015 because he failed his CDL physical examination and was deemed by Caduceus as "Disqualified/Off Work" due to "glaucoma/hypertension."  (Bailey Dep. at 21).  This action was not unlike placing Plaintiff on involuntary leave for failure to meet a qualification standard.  29 C.F.R. § 1630.2(1)(1).  The evidence also shows that Defendant did not allow Plaintiff to return to work when he presented documents prepared by an independent examining physician showing that Plaintiff met the requirements for a CDL.  (Smart Dep. at 87-88).  The remaining issue, then, is whether Defendant placed Plaintiff on leave "because of" his glaucoma/hypertension.  42 U.S.C. § 12102(3)(A).

The Court finds that genuine issues of material fact remain regarding whether Defendant can be held responsible for the actual findings of Caduceus, whether Defendant had knowledge of Plaintiff's medical condition, or whether

there is evidence that Defendant reviewed Plaintiff's medical records such that Defendant could regard Plaintiff as disabled. Defendant argues in its Objections that the Magistrate Judge erred in finding that a genuine issue of material facts exists here because there is no evidence that any employees of Defendant, involved in the employment actions he complains of, perceived or regarded him as disabled or even made any comments whatsoever to that effect. ([81] at 15).

The Court finds otherwise, and Defendant's Objections on this issue are overruled. The record shows that Nurse Bailey and Drainage Administrative Service Manager Leo Owens appear to have received the Caduceus report and have had some degree of knowledge of Plaintiff's glaucoma and hypertension. (Bailey Dep. at 19-20, 22). There is also evidence that Peggy Allen, the associate director of Roads and Drainage and Owens's supervisor, received a memo explaining Caduceus's findings regarding Plaintiff. (Bailey Dep. at 22). Allen testified that she learned of Plaintiff's vision issues in June 2015. (Deposition of Peggy Allen [58] ("Allen Dep.") at 29-32). Allen also testified that someone in Defendant's Human Resources Department would have knowledge about the facts surrounding Plaintiff's CDL physical examination failure. (Id.).

For these reasons, the Court finds that a genuine issue of material fact exists

as to whether Defendant regarded Plaintiff as disabled, and therefore summary

judgment is denied on this issue.

B.      "Qualified Individual"

Plaintiff next asserts, and Defendant rebuts, that he is a "qualified

individual" under the ADA.  Under the ADA, a "qualified individual" is defined as

follows:

> The term "qualified individual" means an individual who, with or
> without reasonable accommodation, can perform the essential
> functions of the employment position that such individual holds or
> desires. For the purposes of this subchapter, consideration shall be
> given to the employer's judgment as to what functions of a job are
> essential, and if an employer has prepared a written description before
> advertising or interviewing applicants for the job, this description
> shall be considered evidence of the essential functions of the job.

42 U.S.C. § 12111(8).  "Accordingly, an ADA plaintiff must show either that he

can perform the essential functions of his job without accommodation, or, failing

that, show that he can perform the essential functions of his job with a reasonable

accommodation."  D'Angelo v. ConAgra Foods, Inc., 422 F.3d 1220, 1227 (11th

Cir. 2005). (citation and internal quotation marks omitted).  The relevant time

period for evaluating whether an individual is "qualified" is at the time of

termination.  See Paleologos v. Rehab Consultants, Inc., 990 F. Supp. 1460, 1464

(N.D. Ga. 1998) (summary judgment granted in favor of defendant where plaintiff could not show she was a qualified individual).

"An essential function is a fundamental job duty of a position, and does not include marginal functions of the position." Mason v. United Parcel Service Co. Inc., 674 F. App'x  943, 951 (11th Cir. 2017) (citing Earl v. Mervyns, Inc., 207 F.3d 1361, 1365-66 (11th Cir. 2000)). "[A] job function may be considered essential because the very reason the position exists is to perform that function." Vincent v. Wells Fargo Guard Services, Inc., 3 F. Supp. 2d 1405, 1416 (S.D. Fla. 1998) (providing examples of essential job functions of different types of positions, including that an essential job function of a bus driver is the ability to distinguish between red, yellow, and green).  "Determining whether a particular job duty is an essential function involves a factual inquiry to be conducted on a case-by-case basis." Anderson v. Embarq/Sprint, 379 F. App'x 924, 927 (11th Cir. 2010).

In determining which functions are essential, "[c]ourts consider the employer's judgment . . . as well as (1) the amount of time spent on the job performing the function, (2) the consequences of not requiring the individual to perform the function, (3) the terms of a collective-bargaining agreement, (4) the work experience of individuals who held the job in the past, and (5) the work

experience of individuals currently in similar jobs." <u>Anderson</u>, 379 F. App'x at 927-28; <u>see also</u> <u>Paleologos</u>, 990 F. Supp. at 1466.

One part of the qualified individual inquiry is whether or not an employee could have been qualified and able to perform essential job functions if afforded reasonable accommodation. <u>See</u> 42 U.S.C. § 12111(8); <u>see also</u> <u>D'Angelo</u>, 422 F.3d at 1229; Earl, 207 F.3d at 1367. If a plaintiff cannot perform essential functions of his job, even with a reasonable accommodation, then he is not a "qualified individual" and is unable to establish a *prima facie* case. <u>Jarvela v. Crete Carrier Corp.</u>, 776 F.3d 822, 828–31 (11th Cir. 2015) (summary judgment granted in favor of defendant employer on ADA discriminatory termination claim after evaluating employer's written job description, including provision that driver must qualify under applicable DOT regulations, in determining essential functions of job at the time of termination and holding that plaintiff's then-current clinical diagnosis of alcoholism meant plaintiff could not qualify as a commercial motor vehicle driver under DOT regulations and thus was unable to perform essential functions).

Here, a genuine issue of material fact exists with respect to whether possessing a valid CDL was an essential function for construction supervisors and whether construction supervisors needed to be able to personally drive commercial

vehicles on the job during an emergency situation.  Defendant contends in its Objections that the record establishes, among other things, that maintaining a CDL for the construction supervisor position was an essential job function, that Defendant's written job description provides that maintaining a CDL is an essential job function, and that the consequences for not having a CDL would be adverse. ([81] at 16-20).  Upon a thorough review of the record, however, the Court finds the evidence is not as straightforward as Defendant purports it to be, and the Court overrules Defendant's Objections on this issue.

Defendant's written materials provide support for both parties' legal positions.  Plaintiff's job application inquired about a valid CDL but did not specify that it was essential to the Plaintiff's job.  (Smart Dep. at 24).  In 2007, Defendant published a Classification Specification stating that a minimum requirement for the position is to possess and maintain a CDL.  (Bailey Dep. at 61; Allen Dep. at 70, 75).  The 2007 Classification provides that transporting heavy equipment and/or materials to the job sites is an essential function of the position. (Allen Dep. at 70).  In 2012, DeKalb County published a Roads and Drainage job description for the construction supervisor position.  ([52.21]).  It provides that the employee holding this position is to "[m]aintain a Class A CDL license during the rated period."  (Smart Dep. at 29).  Smart understood that for each year "rated

period," he was to maintain a CDL and that this requirement was in effect for each year that he held the position of construction supervisor. (Id.). The job description also makes clear, however, that the primary duty of the position is to supervise and delegate responsibility to his crew. (Id.).

There is also conflicting evidence regarding the necessity of the construction supervisor to be able to personally drive vehicles requiring a CDL on the job or during an emergency situation. Plaintiff testified that he did not, as a matter of his regular job duties, personally haul heavy equipment or material to road construction worksites and that much of the construction equipment used by the crews does not require a CDL. ([52.1] at 17-17; Smart Dep. 158, 163). For example, Plaintiff explained the construction supervisor role as filling out paperwork and taking measurements. (Smart Dep. at 137-38). Plaintiff testified that he typically relied on his employees to "transport[] heavy equipment" to the job sites and if he ever drove any equipment to the site, it as a "rare occasion[.]" (Smart Dep. at 158, 179-80, 182-83). Plaintiff also explained that he typically drove a pickup truck that was assigned to his crew, which did not require a CDL to operate. (Smart Dep. at 127-28, 141, 159). The parties, moreover, including Defendant's own witnesses, appear to possess conflicting views regarding the role of a construction supervisor and whether he or she is responsible for the crew's use

of vehicles requiring a CDL to operate.  (See, e.g., [52.1] at 18-19; Allen Dep. at 74-84; Brooks Dep. at 11-12).

The Court finds sufficient evidence creating a genuine issue of material fact regarding whether a Class A CDL was an essential function of Plaintiff's job as a construction supervisor.

### C.    Discriminated Because of Disability

The final element necessary to establish a *prima facie* case under the ADA requires Plaintiff to show that he was discriminated against "because of" his disability.  Mazzeo, 746 F.3d at 1268; see also Lewis, 877 F.3d at 1013.  "Under the ADA, there are two distinct categories of disability discrimination: (1) disparate treatment and (2) failure to accommodate." Toliver v. City of Jacksonville, 2017 WL 1196637, at *5 (M.D. Fla. March 31, 2017).  Because the Court has determined, however, that Plaintiff proffers facts sufficient only to show that Defendant may have "regarded [him] as" disabled, the Court need not address whether Defendant failed to make a reasonable accommodation for Plaintiff.[9]  The

---

[9]    In situations where an employee shows that he fits within either the first or second definitions of "disabled" (*e.g.*, that the employee is actually disabled or has a record of being disabled) on the first *prima facie* element, that employee can also meet his burden under the third *prima facie* element by showing the employer failed to make a reasonable accommodation.  Lewis, 877 F.3d at 1013 n.4; see also Boyle v. City of Pell City, 866 F.3d 1280, 1289 (11th Cir. 2017) ("An employer

Eleventh Circuit, moreover, has held that the "evidence tending to prove the 'regarded as' definition of disabled [] often is duplicative of the evidence relevant to the third *prima facie* element." Lewis, 877 F.3d at 1014; see also C.F.R. § Pt. 1630, App. ("While a person must show, for both coverage under the 'regarded as' prong and for ultimate liability, that he or she was subjected to a prohibited action because of an actual or perceived impairment, this showing need only be made once."). The Court therefore relies upon its previous discussion, see supra Section III.A.2, for its determination that a genuine issue of material fact exists regarding whether Plaintiff was subjected to disparate treatment by Defendant.[10]

---

unlawfully discriminates against an otherwise qualified person with a disability when it fails to provide a reasonable accommodation for the disability, unless doing so would impose an undue hardship on the employer."). "In other words, an employer's failure to provide a reasonable accommodation may be evidence that that the employer has discriminated against her 'because of' her disability." Id.

Because the Court concludes that Plaintiff has not advanced sufficient evidence to warrant a finding that he is actually disabled, or that a record of impairment exists, however, we need not address this argument because an employer "is not required to provide a reasonable accommodation to an individual who meets the definition of disability solely under the 'regarded as' prong." Id.; see also 29 C.F.R. § 1630.9(e). The Court declines to adopt the Final R&R's reasoning and recommendation regarding whether Defendant provided a reasonable accommodation standard. The Court sustains Defendant's Objections on this issue. The failure to consider how Plaintiff's perceived disability might be addressed may, of course, be considered as evidence at trial that Defendant considered Plaintiff disabled.

[10] Defendant contends in its Objections that the Magistrate Judge erroneously applied Lewis to relieve the Plaintiff of his burden to show that he was treated

## IV.  CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Magistrate Judge Janet F. King's Final

Report and Recommendation [78] is **ADOPTED IN PART.**  The Court declines to

adopt the Final R&R's recommendation regarding whether Defendant's provided a

reasonable accommodation.

**IT IS FURTHER ORDERED** that Plaintiff's Objections to Order and

Report and Recommendation on a Motion for Summary Judgment [80] and

Defendant's Objections to the Magistrate Judge's Report and Recommendation

[81] are **OVERRULED IN PART**.  The Court sustains Defendant's Objections

regarding whether the Magistrate Judge properly considered whether Defendant

provided a reasonable accommodation.

**IT IS FURTHER ORDERED** that Plaintiff James Anthony Smart, Jr.'s

Motion for Summary Judgment [52] and Defendant DeKalb County, Georgia's

---

differently than similarly situated employees outside the employee's protected class.  ([81] at 24).  The Court overrules Defendant's Objections on this point. Lewis stands for the proposition that a showing that a defendant regarded a plaintiff as disabled necessarily shows that he or she was set apart from his fellow workers because of his perceived disability.  Lewis, 877 F.3d at 1011 ("Indeed, the department's own stated reason for putting Lewis on leave—that it feared for her safety in view of her heart condition—demonstrates the department's belief that Ms. Lewis's medical condition set her apart from other police officers.").

Motion for Summary Judgment [66] are **DENIED**.

      **SO ORDERED** this 26th day of February, 2018.

WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE